651 F.2d 96
 Donald J. LAREAU, Plaintiff-Appellee,
v.
John R. MANSON, Commissioner of Correction, State of
Connecticut, Defendant- Appellant.
Jesus CAMPOS, James Scott, Jr., Donald J. Lareau and
Clarence King, Plaintiffs-Appellees,
v.
John R. MANSON, Commissioner of Correction, State of
Connecticut, and Richard Wezowicz, Warden,
Hartford Community Correctional Center,
Defendants- Appellants.
 No. 948, Docket 81-2012.
 United States Court of Appeals,
Second Circuit.
 Argued March 13, 1981.
Decided June 1, 1981.
 
 Stephen J. O'Neill, Asst. Atty. Gen., Hartford, Conn. (Carl R. Ajello, Atty. Gen., State of Conn., Hartford, Conn., of counsel), for defendants-appellants.
 Jon C. Blue, Legal Assistance to Prisoners, Hartford, Conn. (James W. Greene, Jr., Legal Assistance to Prisoners, Martha Stone, Connecticut Civil Liberties Union Foundation, Hartford, Conn., of counsel), for plaintiffs-appellees.
 Aryeh S. Friedman, New York City, for amicus curiae Lawyers Committee for Intern. Human Rights.
 Jerome N. Frank, Legal Services Organization, New Haven, Conn. (Renee D. Chotiner, John L. Pottenger, Jr., Stephen Wizner, Alice Bussiere, New Haven, Conn., of counsel, Miriam Berkman, Yale Law School Intern, on brief), for amici curiae Citizens for Humanizing Criminal Justice, Conn., Citizens Lobby, Criminal Justice Committee, Community Return, Inc., Criminal Justice Program, Catholic Family Services, Emergency Civil Liberties Committee, Legal Aid Ass'n of Hartford, New York City Chapter, Nat. Lawyers' Guild, Project More, Unitarian Universalist Criminal Justice Coalition, Urban League of Greater New Haven.
 Before FRIENDLY, MANSFIELD and KEARSE, Circuit Judges.
 MANSFIELD, Circuit Judge:
 
 
 1
 John R. Manson, Commissioner of Correction of the State of Connecticut, and Richard Wezowicz, Warden of the Hartford Community Correctional Center ("HCCC"), appeal from a judgment of the District Court for the District of Connecticut entered pursuant to a Memorandum of Decision by Judge Jose A. Cabranes, Lareau v. Manson, 507 F.Supp. 1177 (D.Conn.1980), in a class action brought under 42 U.S.C. § 1983 by HCCC inmates, finding that the overcrowded conditions at the HCCC violate the constitutional rights of pretrial detainees and of sentenced inmates incarcerated there and ordering, among other relief, a reduction in the HCCC's nighttime population to a maximum of 390 inmates, the number for which the institution was originally designed. With modification to take account of the duration of inmates' confinement under some of the challenged conditions, we affirm the district court's findings of liability with respect to both classes of prisoners. The absolute population cap order, however, is vacated and the case remanded for reconsideration of the remedy consistent with the discussion below. In the interim we direct that certain specific minimum steps be taken to eliminate immediately certain unconstitutional conditions prevailing in the HCCC.
 
 
 2
 The plaintiffs, who include both pretrial detainees and sentenced prisoners, alleged that a number of the conditions of their confinement amounted to constitutional violations. These included, in addition to the primary complaint of overcrowding, inadequacies in health care, sanitation, food, heating, recreation, counseling services and safety. The case was tried over a period of 18 days before United States Magistrate F. Owen Eagan who made two trips to the HCCC and one to the Metropolitan Correctional Center ("MCC") in Manhattan, which was the subject of the Supreme Court's decision in Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), a case of manifest importance in these proceedings.
 
 
 3
 On September 19, 1980, the Magistrate filed proposed findings of fact and a recommended decision which concluded that some of the conditions complained of by the plaintiffs were serious enough to amount to punishment without due process in violation of the Fourteenth Amendment rights of pretrial detainees and other conditions so oppressive as to constitute cruel and unusual punishment of sentenced prisoners in violation of the Eighth Amendment. The Magistrate suggested that the defendants develop a plan to deal with the problems he had isolated. His findings were then referred to the district court, which allowed the parties to submit objections to the Magistrate's proposed findings (to which submissions the Magistrate responded) and required the defendants to submit a proposed remedial plan. Both the plaintiffs and the defendants submitted such proposed remedial orders. On November 25, 1980, the district court filed its own findings of fact which were later clarified and modified on December 19, 1980, after additional oral argument.
 
 
 4
 The district court concluded that the overcrowded conditions in the HCCC, specifically the double-bunking of cells, the overloading of dayrooms, the use of one dayroom as a dormitory and the confinement of healthy prisoners in hospital or isolation cells (sometimes with physically or mentally ill cellmates), and the failure to screen new inmates for communicable diseases, violated the constitutional rights of all the inmates. The court concluded that overcrowding was the root of most of the other complaints put forward by the plaintiffs and refused to find additional specific violations. To remedy the unconstitutionality, the court required the defendants to reduce the nighttime population of the HCCC to 390 men, the capacity for which the institution was designed, and keep it at that level. The order forbids any cell sharing, placing of healthy inmates in the hospital section, or use of dayrooms for sleeping. It also requires implementation of procedures to screen new admittees for disease. The defendants' motion for a stay of this order pending appeal was denied by the district court, but then granted by us.
 
 
 5
 The HCCC is a modern facility which is traditionally organized rather than structured according to the more innovative design of the MCC. It was meant to house a maximum of 390 inmates 360 in individual cells and 30 in a separate work release area. In addition there are 8 medical cells and 6 special isolation cells, none of which were intended for general housing purposes. The prison consists of 3 separate overall units known as the (1) east, (2) west, and (3) central, each of which has several floors. Each floor in turn has several "wings." The east and west units each have 3 floors, 2 of which contain 4 wings and 1 of which has 3 wings. The central unit has 2 floors with 4 wings each.
 
 
 6
 Thus there are 30 wings in all. Each wing consists of a corridor lined with 12 cells and 1 dayroom. The wings radiate out from one central security control "bubble" where a single correctional officer oversees all wings of each floor, supervising inmates in 36 to 48 cells. The 30 wings provide 360 individual cells known as "general population" cells and 30 dayrooms.
 
 
 7
 Each general population cell measures between 60 and 65 square feet and contains an open toilet/sink fixture, a single metal desk, a single chair and a free standing metal cot or, in 120 cells, a bunk-bed. These furnishings take up approximately 24 square feet, leaving between 36 and 41 square feet of living space. The illumination provided in each cell is insufficient to allow more than one inmate to read or write at night and the defendants claim in their proposed plan that the rewiring of these cells to enable two people to read simultaneously is "structurally and economically unrealistic if not impossible."
 
 
 8
 The dayrooms, intended to accommodate a maximum of 12 inmates for dining and 9 for recreation, vary in size from 225 to 262 square feet. Each contains a toilet, a television and a steel table with 12 built-in swinging stools. In some dayrooms stacking chairs have been added to help with the overflow.
 
 
 9
 Unanticipated delays in the construction of the state's new facility at Cheshire, Connecticut, expected to be ready for occupancy at the end of 1981, have forced the defendants to house in the HCCC prisoners in numbers far greater than the 390 it was built to hold. The figures fluctuate, but between January 7, 1980, and the date of the district court decision, the HCCC had no fewer than 500 inmates on any night. The district court found that prior to the finding of unconstitutionality, the population was expected by defendants to reach the range of 580 to 630 by December 1980. On January 29, 1981, the date of defendants' motion for a stay, the HCCC housed 548 inmates. This represented approximately a 40% excess over design capacity. At oral argument before this court on March 13, 1981, counsel for the defendants represented that, in spite of the stay, defendants had been taking steps to reduce the population and that as a result the morning "count" that day was down to 457 inmates.
 
 
 10
 The human overflow in the HCCC has been accommodated at various times in three principal ways. First and foremost, 120 of the 360 general population cells (which do not include the 30 single work release cells) have been equipped with double-bunks. Additionally, there were occasions when cells had double occupancy without the benefit even of double-bunk beds. In such cases a second mattress was put on the floor at night, almost completely eliminating even the little square footage of room for movement which is left to regularly double-bunked inmates.
 
 
 11
 Second, the defendants converted an all-purpose dayroom into a dormitory. Dubbed the "fishtank" because of its glass walls, it has housed as many as 9 men. When so filled, inmates had to crawl over one another to reach the single toilet provided to them. The proposed plan submitted by the defendants below claimed that the fishtank had already been "completely restructured." However, this restructuring apparently only amounted to using bunk-beds in the fishtank and reducing the number of inmates from 9 to 8.
 
 
 12
 Third, the 14 cells in the "medical unit" (8 medical cells and 6 special isolation cells), all without sufficient light to allow an inmate to read, have been used for the housing of healthy inmates who do not present discipline problems. At times these cells, though not designed for general housing of even single inmates, have been double-bunked. Indeed, healthy inmates were sometimes doubled-up and confined for 23 out of 24 hours in a day with physically ill or psychiatrically ill cellmates. There are representations that use of the HCCC's medical unit for general housing purposes has been discontinued.[1]
 
 
 13
 The overloading at the HCCC invidiously infects numerous aspects of the inmates' environment. Living in the double-bunked cells themselves, not to mention the fishtank or medical cells, amounts to mere survival. With only 36 square feet of free space for two inmates, mobility is greatly constrained. The district court's factual findings state that exercise in such circumstances is "difficult if not impossible." The doors of the general population cells are solid with glass windows which do not open and there is no way for inmates to contact the guard for their wing verbally from inside their cell.[2] Thus, if an inmate is being victimized by his cellmate, his only recourse is to slip pieces of paper or other narrow objects through the crack between the door and the doorjamb until the guard happens to look in his direction and notice.
 
 
 14
 At the same time overcrowding undermines the viability of the principal alternative to the hardships and dangers of the double cells the dayrooms. Although inmates may choose at various points in the day whether to pass time in their cells or in the dayrooms, they do not have freedom to move back and forth between the cells and the dayrooms as do prisoners in the MCC. Once an inmate has decided where to spend each of the several periods into which the day is divided, he is locked in his chosen location for the duration of that activity period. The dayrooms themselves are similar only in name to the 1,766 square-foot common rooms in the MCC. The 225 to 262 square-foot dayrooms at HCCC are suitable only for inactive recreation as playing cards, watching television or perhaps reading.
 
 
 15
 As a result of the population increases at the HCCC, dayrooms designed for 12 persons regularly contain 15 to 20 inmates and have held as many as 24 inmates. In order to provide all inmates with seats at the dayroom tables at mealtimes, defendants have instituted the practice of serving meals to inmates in staggered shifts. Even then some inmates have had to sit on the floor, radiator or toilet while eating. The Magistrate found that "based on personal observation, we can say that the noise and activity level in the dayrooms closely resembles that which can be observed in a New York subway during rush hour."
 
 
 16
 There is very limited opportunity for recreation. From mid-April to late October (weather permitting) inmates are allowed to exercise in certain outdoor courtyards for one and one-half hours per day, Monday through Friday. On weekends and during periods of inclement weather, there is no recreation at all. During the remaining six months of the year, inmates are allowed the use of a gymnasium for one and one-half hours twice a week. Since the recreation is unsupervised, the 10 or 12 strongest men generally monopolize the marginally adequate space and equipment. Additionally, court appearances, visiting, sick call, counseling, trips to the commissary, religious services, or drug abuse programs may occasionally break the pattern of cell-dayroom confinement briefly for some inmates. But, the dayroom remains the principal alternative to staying in the cells and, as the district court specifically stated in its factual findings, "(m)ost inmates therefore spend nearly all of their time either in their cells or the dayrooms." Thus, there is no real respite for the double-bunked inmate from the pressures of overcrowding.
 
 
 17
 Further, the problems resulting from the overcrowding include more than just the inmates' lack of physical comfort or privacy. The inmates' safety has become more difficult to maintain and the incidence of fighting and the level of tension have increased. The lone correctional officer located inside the security bubble supervises 48 to 60 inmates at a time. At least once every hour that officer leaves his bubble to conduct a cell check. The dayrooms in the unit are then left unsupervised for periods of one or two minutes. Even when he is in the bubble, the crowded condition of the dayrooms impairs his ability to see into the dayrooms because inmates can now position themselves in such a way as to block his view. Further, because the rear wall of the bubble is not transparent, the south dayroom of each housing unit, located to the rear of the bubble, cannot easily be seen by the correctional officer stationed within. Despite the increase in population since the HCCC opened in 1977, the number of staff has remained constant.
 
 
 18
 The level of various services provided to inmates at the HCCC has deteriorated as the population has increased. For example, as the district court summarized in its opinion below,
 
 
 19
 "... each of the four counselors at the facility assigned to conduct 'intake' interviews with newly arrived inmates, to act as liaisons between inmates and agencies outside the institution, and to assist inmates with their personal problems now has a caseload of approximately 130 inmates. It is hardly surprising that the counselors are unable to respond to all of the requests (approximately 40 to 60 per counselor daily) for help which the inmates make. The psychiatrist who visits the HCCC weekly sees 152 inmates per month, but cannot see many more inmates who desire his assistance. Those inmates fortunate enough to obtain appointments with the psychiatrist see him for an average of only 7 to 8 minutes. Finally, the increased population of the HCCC has caused an increase in the number of visitors who come to see the inmates. The defendants have responded to this development by curtailing the period of visitation for inmates to 45 minutes per inmate per day." 507 F.Supp. at 1180.
 
 
 20
 The district court went on to note that "the overcrowded conditions have strained the provision of medical care to inmates at the HCCC."
 
 
 21
 Lastly, in reference to the effects of the overcrowding, the district court found that it had "adverse psychological impact", id., on the detainees and influenced some to plead out in the hope of shortening their time of confinement.
 
 
 22
 The yearly prison population enduring these hardships is made up of approximately three-quarters pretrial detainees. The remainder are sentenced prisoners, persons being held in connection with immigration proceedings, and persons awaiting transfers to other institutions. Among the pretrial detainees incarcerated at the time of trial, 94 were being held in lieu of bonds of $1,000 or less. The typical length of incarceration for prisoners in the HCCC is the subject of much statistical evidence in the record and some dispute. The defendants prefer to cite the statistics for the overall average length of stay. 73.1% of the men incarcerated in the HCCC during 1979 spent 30 days or less and only 16.9% spent more than 60 days. These average stay figures are the type of data referred to by the Supreme Court in Wolfish.
 
 
 23
 The plaintiffs, on the other hand, showed that if the population of the HCCC is viewed not in terms of overall comings and goings, but in terms of its breakdown on any given day, the results are quite different. On any given day in 1979, the bulk of the HCCC's population was comprised of inmates in for longer periods. For example, at any one point in time, 67.6% of the population had been incarcerated for more than 60 days. These disparate statistics result from a high turnover of "shorttimers." A lot of inmates go in and out within 10 days, replaced by other shorttimers. This lowers the average length of stay, but it does not affect the daily confinement breakdown where over 67% of the individuals suffering under the overcrowded conditions will have endured them for more than 60 days.[3]
 
 
 24
 Neither of these opposing statistical approaches is dishonest. They merely measure different things. Assuming a violation of the inmates' constitutional rights, the plaintiffs' figures demonstrate the need for a remedy; the defendants' have greater relevance to what the remedy should be.
 
 
 25
 Despite the overcrowding of the HCCC and its obvious potential for increasing the risk of disease, no screening of incoming inmates is done by any medical personnel. Physical examinations are not routinely given. The only intake medical evaluation is that of a corrections officer who notes obvious medical or psychiatric problems.
 
 DISCUSSION
 
 26
 The constitutional standard by which the legality of conditions of confinement for pretrial detainees is to be measured differs from that applicable in the case of sentenced inmates. For the former group the test is whether the conditions amount to "punishment" without due process in violation of the Fourteenth Amendment. Bell v. Wolfish, supra, 441 U.S. at 535, 99 S.Ct. at 1872. For the latter, who may be punished, the criterion is whether that punishment is "cruel and unusual" within the meaning of the Eighth Amendment. Hutto v. Finney, 437 U.S. 678, 685, 98 S.Ct. 2565, 2570, 57 L.Ed.2d 522 (1978). Thus, the conditions must, for the most part, be considered separately with respect to each group according to the applicable standard in order to determine their constitutionality as applied to that group. Because roughly three-quarters of the men crowded into the HCCC annually are pretrial detainees and because the rights of pretrial detainees were the subject of the discussion in Wolfish which rejected a challenge to double-bunking that appears similar on its surface to a central claim in this case, we will begin with a review of the district court's determination that the overcrowding at the HCCC "punished" the pretrial detainees held there.
 
 Overcrowding of Pretrial Detainees
 
 27
 Wolfish established the framework for evaluating complaints of unconstitutional prison conditions by pretrial detainees. A class of inmates in the MCC, consisting mostly (but not only) of prisoners being detained in advance of federal trial, objected to a host of restrictions and conditions prevailing in the MCC. The Second Circuit, in Wolfish v. Levi, 573 F.2d 118, 124 (2d Cir. 1978), upheld most of the detainees' challenges by applying what was called the "compelling necessities" test. The Supreme Court rejected this standard, stating instead that the proper inquiry was whether the conditions amounted to "punishment" of the detainee. In general terms, that issue was said by the Court to depend on whether the "disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." Wolfish, supra, 441 U.S. at 538, 99 S.Ct. at 1873. Absent a showing of express intent to punish, the determination "generally will turn on 'whether an alternative purpose to which (the restriction) may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned (to it).' " Id., quoting Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168-69, 83 S.Ct. 554, 567-68, 9 L.Ed.2d 644 (1963).
 
 
 28
 With respect to the specific challenge to the double-bunking occurring in the MCC, however, the Court, in concluding that double-bunking "as practiced at the MCC did not amount to punishment," 441 U.S. at 541, 99 S.Ct. at 1875, focused on the extent of the hardship imposed on the detainees:
 
 
 29
 "We disagree with both the District Court and the Court of Appeals that there is some sort of 'one man, one cell' principle lurking in the Due Process Clause of the Fifth Amendment. While confining a given number of people in a given amount of space in such a manner as to cause them to endure genuine privations and hardship over an extended period of time might raise serious questions under the Due Process Clause as to whether those conditions amounted to punishment, nothing even approaching such hardship is shown by this record." 441 U.S. at 542, 99 S.Ct. at 1875. (Footnote omitted).
 
 
 30
 The defendants here rely on the first sentence of that paragraph as authority against the plaintiffs' claims of unconstitutional overcrowding in the HCCC. Wolfish, however, plainly did not hold that double-bunking, much less institution-wide overcrowding, was per se permissible. Rather the above-quoted paragraph and the opinion as a whole show that under conditions worse than those at the MCC overcrowding could constitute punishment. See, e. g., Campbell v. Cauthron, 623 F.2d 503, 507 (8th Cir. 1980); Benjamin v. Malcolm, 495 F.Supp. 1357 (S.D.N.Y.1980). The question is one of degree and must be considered in light of the particular circumstances of each case and the particular facility in question. Indeed, in its double-bunking discussion the Wolfish court itself highlighted the factual sensitivity of the inquiry, stating:
 
 
 31
 "The cases cited by respondents concerned facilities markedly different from the MCC. They involved traditional jails and cells in which inmates were locked most of the day. Given this factual disparity, they have little or no application to the case at hand. Thus we need not and do not decide whether we agree with the reasoning and conclusions of these cases." 441 U.S. at 543 n. 27, 99 S.Ct. at 1876 n. 27.
 
 
 32
 At the same time we recognize that Wolfish does establish a stringent test for determining when overcrowding will amount to punishment. It must be shown that the overcrowding subjects a detainee over an extended period to genuine privations and hardship not reasonably related to a legitimate governmental objective. The district court concluded that the "overcrowded conditions at the HCCC are so egregious and so unsupported by any rational or legitimate justification that they are unconstitutional insofar as they affect the pretrial detainees in the plaintiff class." 507 F.Supp. at 1190. For the reasons outlined below, we believe that this conclusion is amply supported, with only the caveat that the duration of confinement should be taken into account in judging the constitutionality of certain conditions.
 
 
 33
 The record is clear that pretrial detainees held at the HCCC are subject to much greater hardship than those at the MCC. First, the 60 or 65 square-foot double-bunked cells in the HCCC are themselves 10 to 15 square feet smaller than the doubled cells in the MCC. Moreover, in Wolfish emphasis was placed on the fact that the MCC inmates were required to spend only 7 or 8 hours a day in their cells, during which time they presumably slept, 441 U.S. at 543, 99 S.Ct. at 1876, and that for the rest of the time the detainees were free to move between their cells and the dayroom, which in the MCC is 1,766 square feet (as against 225 to 262 square feet at the HCCC) and has recreational equipment in it. For this specific reason the Supreme Court discounted the emphasis placed by the lower courts in Wolfish on the amount of walking space in the double-bunked cells. 441 U.S. at 543 n. 26, 99 S.Ct. at 1876 n. 26.
 
 
 34
 Here, the cell overcrowding cannot be so avoided by a double-bunked inmate. The dayrooms themselves, which are relatively tiny, are extremely overcrowded. There is often not enough room for all inmates to sit at the table to eat. Some have had to sit on radiators or on the floor. There is not enough room for any active recreation and the noise level is that of a subway at rush hour. HCCC inmates may not move freely from one locale to another. Those in the hospital unit are not allowed even to go into the overcrowded dayrooms. Thus, in this case, in contrast to Wolfish, the lack of living space in the doubled cells is compounded rather than alleviated by the situation in the common areas.
 
 
 35
 These facts alone distinguish the conditions at the HCCC from those confronting detainees in the MCC, a facility described by this court as representing "the architectural embodiment of the best and most progressive penological planning." Wolfish v. Levi, supra, 573 F.2d at 121. But in addition, while the end figures for average length of stay of detainees at the HCCC may not be very different than the figures for the MCC referred to in Wolfish, other statistics in our case clearly show that the majority of the HCCC inmate population suffering under these conditions on any day has been incarcerated for more than 60 days. That numerous individuals must only endure the hardships for relatively short periods of time cannot justify their imposition on other individuals for extended periods the more so where those latter individuals comprise the bulk of the daily population.[4]
 
 
 36
 Likewise, the district court's further conclusion that these hardships are not reasonably related to any legitimate governmental purpose is amply supported. As the court observed, they do not serve the purposes of
 
 
 37
 " 'ensuring a detainee's presence at trial,' Bell v. Wolfish, supra, 441 U.S. at 540 (99 S.Ct. at 1874), 'maintaining security and order,' id., or anything else which might have any tendency to promote 'the effective management of the detention facility.' Id. To the contrary, on the record before this court, the overcrowded conditions at the HCCC have increased security problems and made more difficult the effective management of the institution." (Footnote omitted). 507 F.Supp. at 1189.
 
 
 38
 The only conceivable purpose overcrowding in the HCCC serves is to further the state's interest in housing more prisoners without creating more prison space. This basically economic motive cannot lawfully excuse the imposition on the presumptively innocent of genuine privations and hardship over any substantial period of time, see, Campbell v. Cauthron, supra, 623 F.2d at 508; Detainees of Brooklyn House of Detention for Men v. Malcolm, 520 F.2d 392 (2d Cir. 1975), although it might in certain circumstances justify some flexibility in the remedy ordered.
 
 
 39
 We therefore agree with the district court that the incarceration of healthy and nondisruptive detainees in the fishtank or in the medical and isolation unit in any of the various manners reflected in the record imposes unconstitutional punishment on them. We also agree that when a detainee is subjected for a substantial length of time to the combination of double-bunked cells, overcrowded dayrooms and strained prison services found in the HCCC, he is being unconstitutionally punished. We do not, however, believe that those latter impositions necessarily rise to the level of punishment when imposed for a short period of time. As Hutto v. Finney, supra, 437 U.S. at 687, 98 S.Ct. at 2571 (1978), indicated with reference to the Eighth Amendment, the length of the confinement cannot be ignored in assessing its constitutionality. Conditions unacceptable for weeks or months might be tolerable for a few days. Based on our appraisal of the record, we conclude that the double-bunked cells and overloaded dayrooms at the HCCC would be constitutionally permissible for presumptively innocent detainees for a maximum of 15 days, by which time they would become unacceptable punishment in violation of the Fourteenth Amendment.[5] The 15-day period might be exceeded by two or three days when it is certain that the detainee would be released within that time. However, since the conditions would even then subject pretrial detainees to severe hardships before the expiration of that maximum period, every effort should be made to further shorten the 15-day period of double-bunking of such inmates. The use of the fishtank, floor mattresses and medical unit practices, however, are too egregious to warrant any such leeway. They constitute punishment without regard to the number of days for which a prisoner is so confined.
 
 Overcrowding of Sentenced Inmates
 
 40
 For the sentenced inmates in the HCCC the question is whether the conditions contravene the Eighth Amendment. That Amendment's prohibition of cruel and unusual punishment embodies evolving contemporary standards of dignity, humanity and decency. In Finney the Supreme Court stated that:
 
 
 41
 "The Eighth Amendment's ban on inflicting cruel and unusual punishments, made applicable to the State by the Fourteenth Amendment, 'proscribe(s) more than physically barbarous punishments.' Estelle v. Gamble, 429 U.S. 97, 102 (97 S.Ct. 285, 290, 50 L.Ed.2d 251). It prohibits penalties that are grossly disproportionate to the offense, Weems v. United States, 217 U.S. 349, 367 (30 S.Ct. 544, 549, 54 L.Ed. 793), as well as those that transgress today's ' "broad and idealistic concepts of dignity, civilized standards, humanity, and decency." ' Estelle v. Gamble, supra, (429 U.S.) at 102 (97 S.Ct. at 290), quoting Jackson v. Bishop, 404 F.2d 571, 579 (CA8 1968). Confinement in a prison or in an isolation cell is a form of punishment subject to scrutiny under Eighth Amendment standards." 437 U.S. at 685, 98 S.Ct. at 2570.
 
 
 42
 In a part of Wolfish v. Levi undisturbed by the Supreme Court we set out the specific categories of Eighth Amendment concern, stating that convicted prisoners are entitled only to "adequate food, clothing, shelter, sanitation, medical care and personal safety. The Constitution does not require that sentenced prisoners be provided with every amenity which one might find desirable." 573 F.2d at 125.
 
 
 43
 To inform itself of contemporary standards, the district court considered correctional guidelines and standards from a number of organizations. It found that cell square footage per prisoner at the HCCC not only fell far short of the United Nations Standard Minimum Rules for the Treatment of Prisoners[6] which were explicitly adopted by the defendants themselves as the preamble to the Administrative Directives of the Connecticut Department of Correction, but those of numerous other groups. For instance, the standards of the American Correctional Association require that 60 square feet of cell space be accorded prisoners spending no more than 10 hours per day in their cells and that 80 square feet be accorded prisoners spending more than 10 hours per day in their cells.[7] The National Sheriffs' Association Standards require 70 to 80 square-foot cells.[8] The American Public Health Association requires 60 square feet per person in single cells and a minimum of 75 square feet per person in dormitories.[9]
 
 
 44
 Other courts seeking some indications of what are acceptable minimum conditions have also looked to these and other organizations. Capps v. Atiyeh, 495 F.Supp. 802, 810 (D.Or.1980), which held that overcrowded conditions and residual effects similar in many ways to those in this case[10] violated the Eighth Amendment, referred, in addition to each of the above standards, to the draft Federal Standards for Corrections which require that dormitory living units house no more inmates than can be safely and effectively supervised in a setting which provides at least 60 square feet per inmate. Chapman v. Rhodes, 434 F.Supp. 1007, 1021 (S.D.Ohio 1977), aff'd, 624 F.2d 1099 (6th Cir.), cert. granted, --- U.S. ----, 101 S.Ct. 353, 66 L.Ed.2d 214 (1980), outlined several of these same guidelines and then went on to point out that the United States Army, "not known for 'coddling,' " adheres to a 55 square feet standard for confinement of a prisoner and that the National Council on Crime and Delinquency Model Act for the Protection of Rights of Prisoners (1972) had concluded that not less than 50 square feet of floor space in any confined sleeping area should be provided as the minimum. Of these various standards, the Chapman opinion went on to say that all "deal with 'sleeping space' and contemplate additional space for other purposes, such as dayrooms. All are relatively contemporary. All indicate the 'contemporary' standard." 434 F.Supp., at 1021.
 
 
 45
 As against all of these various criteria which call for minima of between 50 and 75 square feet per prisoner, a double-bunked inmate at the HCCC has approximately 30 to 321/2 square feet of space (including space occupied by fixtures and furniture), while an inmate assigned to the fishtank has less than 23 square feet of space (calculated the same way, on the assumption of 9 inmates in the room). As the Supreme Court stated in Wolfish, the recommendations of these professional groups "do not establish the constitutional minima," but they "may be instructive in certain cases." 441 U.S. at 543 n. 27, 99 S.Ct. at 1876 n. 27. Estelle v. Gamble, 429 U.S. 97, 103 n. 8, 97 S.Ct. 285, 290 n. 8, 50 L.Ed.2d 251 (1976), cites the United Nations Standard Minimum Rules as one of many manifestations of "contemporary standards of decency." Here, the various guidelines illustrate the glaring disparity on even the most rudimentary square footage level between the conditions in the HCCC and the conditions widely thought by knowledgeable bodies to be essential. We have not found standards of any organization which would sanction confining convicted prisoners in the small spaces involved here for as much of their sentences as the state saw fit. Of course, cell overcrowding is only one part of the totality of the circumstances caused by the institutionalized overcrowding at the HCCC. It is the totality which the Constitution regulates. Here, however, the other circumstances do not compensate for the deficiency in space but, on the contrary, only worsen the conditions which HCCC prisoners must endure.
 
 
 46
 With respect to the specific practices of confining inmates in the fishtank, forcing men to sleep on mattresses on the floors and placing healthy or nondisruptive inmates in the medical or isolation cells (sometimes double-bunked with ill cellmates and confined for 23 hours a day), we have no trouble upholding the district court's conclusion that these measures do not provide minimum decent housing under any circumstances for any period of time. Perhaps in the event of a genuine emergency situation, like a fire or riot, such recourse could be temporarily excused, see Powell v. Ward, 542 F.2d 101 (2d Cir. 1976), but as regular methods of housing convicted inmates, none of these practices can pass constitutional muster.
 
 
 47
 Despite the contravention of recommended standards for minimum square footage, the double-bunking of convicted prisoners in cells with bunk-beds presents a somewhat closer case. Wolfish is clear that no "one man, one cell" principle inheres in the Constitution. If, as was the case with the inmates in the MCC, the prisoners here were confined to their doubled cells only for sleeping purposes and could freely move into areas which were not overcrowded for all or even part of the day, or if, as another example, the state kept the prisoners doubled for only a set limited duration, the overcrowding might not violate the Eighth Amendment. But ours is not just a "double-bunking case." Here, as detailed above, the overcrowding subjects the inmates to a combination of hardships that reach beyond their cells. The dayrooms, the primary alternative for most double-bunked inmates, are themselves overcrowded. Offering the relief of a noisy subway platform, these alternatives only exacerbate the pressures. Further, it is the sentenced inmates who may most need certain of the various ancillary services which the HCCC is forced to curtail or deny because of overcrowding.
 
 
 48
 Additionally, as we stated in Wolfish v. Levi, supra, 573 F.2d at 125, adequate "personal safety" is a specific Eighth Amendment concern. The heightened security problems caused by the overcrowding have already been outlined. Relegating convicted prisoners for all or an indefinite portion of their sentences to double cells from which they can contact guards only with the greatest difficulty[11] and to dayrooms where the view of the lone guard responsible for as many as 60 inmates can now be easily blocked, does not comport with the duty to provide for adequate personal safety. The district court specifically found as a fact that the overcrowding of the dayrooms has increased the level of tension and anxiety and the incidence of fights. Cf. Chapman v. Rhodes, supra, 434 F.Supp. at 1018 (holding double-celling unconstitutional despite a specific finding of no increase in violence due to the double-celling as opposed to the increase in population). We are unwilling to wait until these increases mature into one of the tragic eruptions which have occurred in overcrowded institutions elsewhere before acting to condemn the conditions which breed them.[12]
 
 
 49
 We conclude that under the totality of these circumstances, subjecting the sentenced inmates in the HCCC to the combination of double-bunking and overcrowded dayrooms violates their constitutional rights when imposed for an excessive period of time. Since the constitutional protections for convicted prisoners are less than for the detainees in the HCCC, the former may be required to endure these conditions for a longer period than detainees before their constitutional rights are implicated. Here we believe that 30 days is a reasonable maximum, subject only to the qualification that the period may be exceeded by two or three days when it is certain that the inmate will be released within that time.
 
 Medical Screening of New Inmates
 
 50
 The district court felt that while the plaintiffs had shown inadequacies in most of the services they challenged (medical, psychiatric, counseling, food, sanitation and recreation), these problems were all closely tied to the gross overcrowding and did not have to be addressed separately. The exception was the failure to adequately screen newly arrived inmates for communicable diseases. The court concluded that the "resulting threat to the well-being of the inmates is so serious, and the record so devoid of any justification for the defendants' policy, that under the standard of Bell v. Wolfish this practice constitutes 'punishment' in violation of the Due Process Clause." 507 F.Supp. at 1195. We agree, believing that it is unnecessary to require evidence that an infectious disease has actually spread in an overcrowded jail before issuing a remedy. The district court stated that because the failure to screen created an indiscriminate threat to all inmates, whether sentenced or detained, the Due Process violation itself mandated a remedy as to all inmates. We agree. Sentenced inmates cannot very well be sure to confine the spread of their diseases to their own inmate group. However, as the district court also noted, the inadequate medical practice here would in any case violate the Eighth Amendment since it represents an "(omission) sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, supra, 429 U.S. at 106, 97 S.Ct. at 292.
 
 Remedy
 
 51
 The district court's order, to the extent that it restricts housing of prisoners in the medical unit, bans the use of the fishtank and requires the institution of screening procedures to identify and isolate new inmates who may have a "communicable disease," is affirmed with minor modifications. These three practices are unconstitutional for all inmates except in genuine emergency situations not shown here. Indeed, the defendants have recognized the undesirability of using the medical and isolation cells and the fishtank as general housing alternatives and are apparently in the process of eliminating these practices.[13] Therefore, we modify the district court's order with respect to these three specific practices only to the extent that the requirements may be temporarily forgiven should "truly exigent circumstances," Powell v. Ward, supra, 542 F.2d at 103, arise. Mere overcrowding, however severe, is of course not such a circumstance. Additionally, we add a blanket prohibition, not mentioned by the district court order, against the quartering of inmates on mattresses on cell floors. Specific instructions with respect to the medical screening of newly admitted inmates are set forth at the end of this opinion.
 
 
 52
 The remainder of the district court's order is not appropriate in its present form. The strict design-capacity population cap and the absolute prohibition on any double-celling ordered by the district court were justified by it as complying with the caution reiterated in Wolfish against excessive intrusion by the courts into prison management. See, 441 U.S. at 547-48, 99 S.Ct. at 1878-79. However, within limits that management must also be allowed some flexibility.
 
 
 53
 The district court's imposition of an absolute population ceiling and its ban on any double-celling not only fail to take into account the duration of the confinement, a factor relevant to the substantive finding of unconstitutionality, but also appear to be based on an unrealistic assessment of the state's ability to comply fully without releasing inmates into the community. In its opinion the district court stated that
 
 
 54
 "the defendants have made contingency plans to house inmates who cannot be housed at the HCCC and other comparable facilities. These plans include opening a 250-bed facility at Camp Hartwell, and housing approximately 100 male inmates classified for minimum security ... at the Niantic Correctional Institution, which has until now been used only to house female prisoners. Moreover, assigning a number of the HCCC's sentenced inmates to half-way houses is another option available to the defendant." 507 F.Supp. at 1181.
 
 
 55
 However, the record reveals that, except to a limited extent at Niantic, these alternatives are not feasible. Corrections Commissioner Manson, both in trial testimony and by affidavit, gave the reasons, which are not countered by contrary factual proof. The state's half-way houses are said to be overfull already. Use of Camp Hartwell would require an expenditure of $2,626,000 just for needed capital improvements before it could be of any use and such improvements could not be made until after the new Cheshire facility would be completed and ready for occupancy. Niantic, however, will apparently be able to house 80 men (with double-bunking), but must also satisfy systemwide needs.
 
 
 56
 We might still defer to the district court's fact finding as not clearly erroneous if the absolute population cap order were otherwise necessary to remedy the unconstitutional overcrowding. But we believe that it can be largely relieved by limiting the maximum duration of inmates' confinement in double cells to the periods discussed above. This more flexible response, which takes some account of the state's resources and also its good faith effort to alleviate the oppressive overcrowding at the HCCC by bringing Cheshire on stream as soon as possible, will have several effects. It will give each inmate, after a period of incarceration, which will vary according to the inmate's status as a detainee or convicted prisoner, a respite from the pressures of overcrowding. He will then have to himself a cell of ample size regardless of the crowds in the dayroom. It will at the same time necessarily reduce the overall number of inmates which the state can pack into the HCCC on any one day while still leaving the state substantially greater flexibility than it would retain with a strict population cap.[14] This in turn will relieve some, and perhaps a significant amount, of the dayroom overcrowding and the strain on prison services.
 
 
 57
 Whether the provision of a single cell to each inmate after a period of confinement and the attendant reduction in the overall population will make unnecessary a separate limitation on the maximum dayroom populations or the additional remedial steps considered in the proposed plans submitted initially by the parties below, we leave to be worked out on remand.
 
 
 58
 Some immediate action by the defendants is essential to relieve inmates of the more egregious current conditions being imposed upon them in violation of their constitutional rights conditions which have now existed for a substantial time. If the case were remanded without some specific interim directions, these conditions could conceivably continue indefinitely pending additional hearings and a new decree, which might then in turn be stayed pending review. Accordingly, we direct that upon remand the following measures shall be put into effect immediately by the defendants:
 
 
 59
 (1) Use of the "fishtank" or mattresses on cell floors for prisoner housing purposes and use of the medical and isolation cells for housing healthy or nondisruptive inmates in the absence of a genuine emergency will be discontinued. If already discontinued, these practices may not be reinstituted.
 
 
 60
 (2) No newly admitted inmate shall be introduced into the general population of the prison or confined in excess of 48 hours without having received an examination by a physician, or by a nurse or medically trained technician operating under the direction of a physician, with specific instructions as to when the physician is to be consulted, and such examination shall include such tests as are necessary in the opinion of the physician to identify and isolate those who have communicable diseases. This requirement shall not apply to newly admitted inmates for whom there is a record of a medical examination having been performed within the three-month period prior to admission. Pending such examination, a newly admitted inmate may be confined in a cell containing no more than one bunk. See order entered by Judge James Harvey in O'Bryan v. County of Saginaw, Mich., 446 F.Supp. 436, 440-41 (E.D.Mich.1978), enforcing, 437 F.Supp. 582 (E.D.Mich.1977).
 
 
 61
 (3) No pretrial detainee may be confined with another inmate in a double-bunked cell for longer than 15 days, which period may be exceeded by two or three days when it is certain that the detainee will be released within that time.
 
 
 62
 (4) No sentenced inmate may be confined with another inmate in a double-bunked cell for more than 30 days, which period may be exceeded by two or three days when it is certain that the inmate will be released within that time.
 
 
 63
 These measures may be modified with the consent of the parties and approval of the district court. They are also without prejudice to the court's issuance of a more detailed decree to the extent not inconsistent with the foregoing.
 
 
 64
 The mandate shall issue forthwith.[15] No costs.
 
 
 65
 FRIENDLY, Circuit Judge, concurring and dissenting:
 
 
 66
 I concur in the portion of Judge Mansfield's opinion that relates to pre-trial detainees; his careful and balanced consideration is in sharp contrast to the inflexible population cap imposed by the district judge, which reminds me of the old saw, "If the ship is leaking, sink it." I also join in so much of his opinion as holds that with respect to convicted prisoners "the specific practices of confining inmates in the fishtank, forcing men to sleep on mattresses on the floors and placing healthy or nondisruptive inmates in the medical or isolation cells (sometimes double-bunked with ill cellmates and confined for 23 hours a day)"[1] constitute cruel and unusual punishment prohibited by the Eighth Amendment as made applicable to Connecticut by the Fourteenth. While I have some doubt that the Eighth Amendment requires medical screening of convicted prisoners, I agree that detainees must be medically screened, and if prisoners are to come in frequent contact with detainees, through double-bunking or otherwise, as a practical matter they must also be examined. Moreover, I do not understand the State to have any real objection to a carefully framed requirement that inmates be examined, such as that embodied in the majority opinion, as distinguished from the vague and open-ended direction in the district court's order, which could leave it open to charges of contempt for action taken in complete good faith. My dissent is thus confined to so much of the opinion as limits double-celling of convicted prisoners for more than 30 days.
 
 
 67
 I find no warrant for this in principle, or in our own decisions, those of the Supreme Court, or those of other courts. Hutto v. Finney, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978), is the only case in which the Supreme Court has thus far held that general prison conditions imposed cruel and unusual punishment. Mere reading of the opinion, id. at 681-85, 98 S.Ct. at 2568-70, not to speak of the more detailed opinions of the district court in Holt v. Sarver, 300 F.Supp. 825 (E.D.Ark.1969); 309 F.Supp. 362 (E.D.Ark.1970), and Holt v. Hutto, 363 F.Supp. 194 (E.D.Ark.1973), suffices to show that the HCCC bears no conceivable resemblance to the Arkansas prison system there condemned. Neither is the double-bunking at the Hartford jail in any way similar to the conditions this court condemned in Wright v. McMann, 387 F.2d 519 (2 Cir. 1967), and 460 F.2d 126 (2 Cir.), cert. denied, 409 U.S. 885, 93 S.Ct. 115, 34 L.Ed.2d 141 (1972). In Wolfish v. Levi, 573 F.2d 118, 125 (2 Cir. 1978), rev'd on other grounds[2] sub nom. Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), we said:
 
 
 68
 The parameters of judicial intervention into the conditions of incarceration for sentenced prisoners are more restrictive than in the case of pretrial detainees. An institution's obligation under the eighth amendment is at an end if it furnishes sentenced prisoners with adequate food, clothing, shelter, sanitation, medical care, and personal safety. The Constitution does not require that sentenced prisoners be provided with every amenity which one might find desirable.
 
 
 69
 No claim is made here that the HCCC has failed to provide adequate food, clothing, or sanitation. With respect to medical care the only fault has been the failure to screen inmates for contagious diseases,[3] and this will be corrected by the examination procedure we today direct the defendants to implement.
 
 
 70
 My colleagues conclude that the state has failed to fulfill its duty to provide adequate protection for personal safety, relying on the district judge's finding that "(t)he overcrowded condition of the dayrooms ... has increased the incidence of fights among inmates"[4] and emphasizing that they are "unwilling to wait until these increases mature into one of the tragic eruptions which have occurred in overcrowded institutions elsewhere before acting to condemn the conditions which breed them." The facts established in this case do not justify such a dire assessment. While the district judge found that the crowding of the dayrooms had led to an increase in the incidence of fights, he made no finding whatsoever with respect to how frequently fights have occurred and whether serious injuries have resulted. Nothing in his findings contradicts the magistrate's explicit finding that "it is not clear whether this atmosphere (the crowded condition of the dayrooms) has caused any significant increase in the numbers or severity of fights among inmates." The judge's vague statement that "(t)he overcrowded condition of the dayrooms ... has increased the incidence of fights" falls far short of what is required before the defendants can be held to have violated their duty to supply reasonable protection for personal safety. Although prisoners at the HCCC undoubtedly face some risk of personal injury, it must be remembered that "probably no prison is a 'safe' place to live and that incidents of violence, including homosexual attacks, are going to occur in the best run prisons." Chapman v. Rhodes, 434 F.Supp. 1007, 1019 (S.D.Ohio 1977) (footnote omitted), aff'd mem., 624 F.2d 1099 (6 Cir.), cert. granted, --- U.S. ----, 101 S.Ct. 353, 66 L.Ed.2d 214 (1980). In recognition of this, previous decisions have required more than occasional injuries to establish a breach of the duty to provide protection for personal safety. See, e. g., Pugh v. Locke, 406 F.Supp. 318, 319 (M.D.Ala.1976), aff'd as modified on other grounds and remanded sub nom. Newman v. State of Alabama, 559 F.2d 283 (5 Cir. 1977); Hite v. Leeke, 564 F.2d 670, 673 (4 Cir. 1977). In the case before us the findings by the magistrate and the district judge themselves indicate that no such showing has been made. Contrast Holt v. Sarver, 300 F.Supp. 825, 830-31 (E.D.Ark.1969); West v. Lamb, 497 F.Supp. 989, 992 (D.Nev.1980).
 
 
 71
 Of the duties identified in Wolfish v. Levi, supra, 573 F.2d at 125, it thus remains only to consider the duty to provide adequate housing. I might agree that under some circumstances overcrowded housing, even standing alone, could impose such hardship as to constitute cruel and unusual punishment. I cannot agree, however, that double-bunking prisoners at the HCCC for more than 30 days, even when coupled with the inadequacy of the day rooms, is inconsistent with "the evolving standards of decency", Trop v. Dulles, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 596 (1958) (plurality opinion), prevailing in our society. The various correctional guidelines and standards cited by the majority and by the district judge do not demonstrate the contrary. For example, the American Correctional Association's Manual of Standards for Adult Correctional Institutions (1977), which is cited by the majority, is clearly aspirational; the Manual expressly states that "(t)he standards reflect new heights to reach, new programs to achieve, and a higher sense of humanity and decency." (P. vii.) While it is salutary that organizations that devote their time to the study of prisons often conclude their efforts by proposing standards designed to improve them, it does not follow that such standards can be relied upon to determine the constitutional requirements to which every state in the nation must immediately conform even though the conditions actually prevailing in most of the nation's prisons do not come near to meeting them.[5] Hence the magistrate recognized that "the conditions at the Hartford facility are no worse than jail conditions elsewhere and indeed, are better than those at many correctional institutions", and the judge made no finding to the contrary. Appellees must carry a heavy burden to show that double-bunking at the HCCC nevertheless violates the Eighth Amendment.
 
 
 72
 Despite the prevalence of conditions of the sort challenged here, appellees would be entitled to prevail if they could show that the hardship imposed by overcrowding at the HCCC does not "comport( ) with the basic concept of human dignity at the core of the (Eighth) Amendment", Gregg v. Georgia, 428 U.S. 153, 182, 96 S.Ct. 2909, 2929, 49 L.Ed.2d 859 (1976) (joint opinion of Stewart, Powell & Stevens, JJ.), for the Amendment clearly prohibits some practices even if they are widely followed. Thus it is well settled that "punishment must not involve the unnecessary and wanton infliction of pain." Id. at 173, 96 S.Ct. at 2925. See Wilkerson v. Utah, 99 U.S. 130, 136, 25 L.Ed. 345 (1879) (Eighth Amendment prohibits "punishments of ... unnecessary cruelty"). The double-bunking of prisoners at the HCCC does not run afoul of this prohibition. The overcrowding at the facility has been attributable not to the callousness of the defendants but rather to the unexpected delay in the completion of the prison at Cheshire. Moreover, the reduced living space, the loss of privacy, and the stress caused by the overcrowding cannot be considered comparable to other hardships that courts have found to be cruel and unusual modes of punishment. Contrast, e. g., Estelle v. Gamble, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976) ("deliberate indifference to serious medical needs"); Jackson v. Bishop, 404 F.2d 571 (8 Cir. 1968) (Blackmun, J.) (use of strap). Although the cells are small, there are a desk and a chair that can be used by one of the prisoners at a time, a double-bunk bed,[6] and space sufficient for the prisoners to stand up and move about though not sufficient for them to partake in active exercise. It is true that the double-bunking has led to crowding of the dayrooms. However, while I agree that subjecting pretrial detainees to the combination of double-bunking and crowded dayrooms for a substantial period of time imposes punishment in violation of the due process clause, I cannot agree that this combination is so onerous as to impose cruel and unusual punishment on the sentenced prisoners in the HCCC. In my judgment the difference between the constitutional status of a person accused of a crime and that of a person convicted of a crime has more significance than the 15-day distinction my colleagues draw. Even if the overcrowding complained of would constitute cruel and unusual punishment were a prisoner subjected to it for a long time, the record indicates that prisoners at the HCCC are confined for relatively short periods.[7]
 
 
 73
 The cases relied upon by the district judge are plainly distinguishable either because living conditions were unsanitary and food was prepared in unclean facilities or was nutritionally inadequate, Adams v. Mathis, 458 F.Supp. 302 (M.D.Ala.1978), aff'd, 614 F.2d 42 (5 Cir. 1980); Ramos v. Lamm, 485 F.Supp. 122 (D.Colo.1979), aff'd in part and rev'd in part, 639 F.2d 559 (10 Cir. 1980), cert. denied, --- U.S. ----, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981); West v. Lamb, 497 F.Supp. 989 (D.Nev.1980); Hoptowit v. Ray, No. 79-359 (E.D.Wash., June 25, 1980), because the prisoners had even less living space, Campbell v. Cauthron, 623 F.2d 503 (8 Cir. 1980), because of "the extremely small amount of time that inmates spend outside their cells", Hutchings v. Corum, 501 F.Supp. 1276 (W.D.Mo.1980), because of the presence of a fire hazard and the failure to provide adequate medical care, Nicholson v. Choctaw County, Ala., 498 F.Supp. 295 (S.D.Ala.1980), or because of the length of confinement, Chapman v. Rhodes, 434 F.Supp. 1007 (S.D.Ohio 1977), aff'd mem., 624 F.2d 1099 (6 Cir. 1980), cert. granted, --- U.S. ----, 101 S.Ct. 353, 66 L.Ed.2d 214 (1980), discussed infra; Capps v. Atiyeh, 495 F.Supp. 802 (D.Ore.1980) (average length of confinement two years), injunction stayed pending decision on appeal or decision in Chapman v. Rhodes, supra, --- U.S. ----, 101 S.Ct. 829, 66 L.Ed.2d 785 (1981) (Rehnquist, J., in Chambers).[8]
 
 
 74
 Much more closely analogous are three well-considered decisions rejecting Eighth Amendment challenges to housing similar to that provided here. See M. C. I. Concord Advisory Board v. Hall, 447 F.Supp. 398 (D.Mass.1978) (sustaining Eighth Amendment objection to double-bunking in unit lacking adequate fresh air, plumbing, and ventilation, but rejecting attack against double-bunking in 66 square-foot cells); Burks v. Walsh, 461 F.Supp. 454 (W.D.Mo.1978) (double-bunking in cells of 47 square feet is cruel and unusual punishment but double-bunking in 59-square-foot and 65-square-foot cells is not); Crowe v. Leeke, 540 F.2d 740 (4 Cir. 1976) (per curiam) (not cruel and unusual punishment to confine three prisoners in 63-square-foot cell).[9] While I agree that one must look at the totality of the circumstances and that the conditions held not to constitute cruel and unusual punishment in the first two of these cases may have been superior in some respects to the conditions challenged here, the double-bunking of prisoners at the HCCC, particularly with the changes which we all agree the defendants must implement, is far more similar to the conditions upheld in those cases than to the conditions that courts have condemned as cruel and unusual punishment.
 
 
 75
 For these reasons I must respectfully disagree with the majority's conclusion that double-bunking of convicted prisoners at the HCCC for more than 30 days constitutes cruel and unusual punishment. I should have considered it preferable to withhold decision on this aspect of the case or at least to stay the issuance of this portion of our mandate until we have the benefit of the Supreme Court's disposition of Chapman v. Rhodes, supra, 434 F.Supp. 1007 (S.D.Ohio 1977), aff'd mem., 624 F.2d 1099 (6 Cir.), cert. granted, --- U.S. ----, 101 S.Ct. 353, 66 L.Ed.2d 214 (1980), now sub judice, which involves double-bunking of sentenced prisoners in cells of roughly 63 square feet, and in which a decision would normally be expected within the next several weeks. To be sure, a decision in favor of the inmates in Chapman would not necessarily be controlling here, since in that case "(s)ixty-seven percent of the inmates were serving either life or first-degree felony sentences", 434 F.Supp. at 1011, whereas practically none of the prisoners at the HCCC are confined for longer than six or seven months and most are confined for substantially shorter periods. See Hutto v. Finney, supra, 437 U.S. at 686, 98 S.Ct. at 2571 ("the length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards"). While it may be that in other respects the conditions in Chapman were somewhat better than at the HCCC, the decision seems certain to cast a good deal of light on the issue with respect to which I am at odds with the majority, and I see no virtue in our having to entertain motions for recall of the mandate, reconsideration, etc. which a Supreme Court decision favorable to the state in Chapman would necessarily provoke.[10] Since my colleagues nevertheless choose to decide this aspect of the case without waiting a few weeks to consider the Court's decision, I must dissent from a conclusion that extends the cruel and unusual punishment clause into new ground, without the support of principle or the authorities now available to us.
 
 
 
 [1]
 In their proposed remedial plan, the defendants stated that "cells in the Medical Unit have ceased being used for housing purposes only nor will they be used for housing purposes in the future." A similar representation was made by counsel at oral argument of this case. It is not completely clear, however, that this necessarily means that use of the isolation cells has also already been discontinued. As to these cells the defendants were willing to propose in their plan that "the use of these six cells will be limited to housing those inmates who are acting out in a manner which disturbs, incites or endangers other inmates or staff or endangers the inmate himself, or for protective custody."
 
 
 [2]
 Defendants' proposed plan states that the glass windows "are being replaced with plexiglass with an open hole." Since this has occurred, if at all, after trial, we have no way of knowing how many windows have been changed or if the change improves communication in any way
 
 
 [3]
 The same statistical schism emerges when the HCCC inmates are broken down by detainees and sentenced prisoners. The data here are less complete, but the effect of the high turnover of shorttimers is the same. For example, the defendants' statistical chart indicates that 73.2% of prisoners who were admitted and released as sentenced inmates spent less than 60 days in the HCCC. On the other hand, though the record does not include a plaintiffs' table for sentenced inmates only, it is clear from the separate tables for detainees and for the population as a whole (which are in the record) that on any given day more than 67% of these same sentenced inmates will have been incarcerated for more than 60 days. This figure derives from tables showing that 67.6% of all inmates on a given day have been in for over 60 days and 60.68% of the detainees on a given day have been in for over 60 days. Therefore, to achieve the 67% average the figure for sentenced inmates must be somewhat greater than that number
 
 
 [4]
 That fact does, however, argue for a remedy, as ordered below, which takes account of the duration of confinement in outlining the deprivations to which an inmate may constitutionally be subjected
 
 
 [5]
 The Magistrate found that double-bunking was unconstitutional punishment for detainees subjected to it for over 30 days and he would have required single cells and design capacity dayrooms (12 persons) for detainees after such time, a requirement he found would "impose no great administrative burden upon the defendants." His reasoning for picking 30 days is unclear and, in light of the inmates' pretrial status, the period is excessive. Although the choice is necessarily somewhat arbitrary, we believe 15 days to be a more reasonable maximum for these hardships. This reduced maximum is appropriate since, in contrast to the Magistrate's method, we are not ourselves at this time requiring any of the additional specific improvements recommended by him. The Magistrate contemplated a 30-day limit under the improved conditions which would result from the defendants' correction of the various specific deficiencies he had isolated (e. g., inadequate lighting, communication, and recreation). Indeed, in his recommended decision, the Magistrate stated that "unless inmates are provided with adequate means by which they can communicate with the guard from their cells, we find double-celling so potentially dangerous as to constitute cruel and unusual punishment."
 Thus, the maximum 30 days of double-bunking recommended by the Magistrate was to be allowed only along with significant changes. In the absence of such changes, the hardships on the detainees are obviously greater and 15 days is an appropriate maximum. Indeed, that figure itself is expansive, representing an effort to take account of the feasibility of compliance in a situation where the state has made detailed plans and achieved substantial progress with the construction of a new facility which should relieve the problem altogether.
 
 
 [6]
 Adopted by the First United Nations Congress on the Prevention of Crime and Treatment of Offenders in 1955 and approved by the Economic and Social Counsel of the United Nations by its Resolutions 663C (LLIV) on July 31, 1957 and 2076 (LXII) on May 13, 1977
 
 
 [7]
 Manual of Standards for Adult Correctional Institutions, American Correctional Association Commission on Accreditation for Corrections, Standard 4142
 
 
 [8]
 Jail Architecture, National Sheriffs' Association, Washington, D.C. 1975
 
 
 [9]
 Standards for Health Services in Correctional Institutions, American Public Health Association, Washington, D.C., 1976
 
 
 [10]
 That court summarized its findings by saying that the overcrowding at the facilities involved there,
 "far exceeds the level of applicable professional standards; has increased the health risks to which inmates are exposed; has impinged on the proper delivery of medical and mental health care; has reduced the opportunity for inmates to participate in rehabilitative programs; has resulted in idleness; has produced an atmosphere of tension and fear among inmates and staff; has reduced the ability of the institutions to protect the inmates from assaults; and is likely to produce embittered citizens with heightened antisocial attitudes and behavior." 495 F.Supp. at 812-13.
 Judge Friendly, at page 15 of his partial dissent, characterizes three decisions rejecting Eighth Amendment claims of convicted prisoners regarding overcrowded conditions as "(m)uch more closely analogous" to our present case. M.C.I. Concord Advisory Board v. Hall, 447 F.Supp. 398 (D.Mass.1978); Burks v. Walsh, 461 F.Supp. 454 (W.D.Mo.1978); Crowe v. Leeke, 540 F.2d 740 (4th Cir. 1976). Proceeding on the accepted basis that the constitutionality of the conditions must be judged by the totality of the circumstances in each case, two of the decisions are distinguishable from this case.
 In M.C.I. the prisoners were allowed much more space and freedom of movement outside of their cells than here and incarcerated under these conditions for a limited period, as the court noted:
 "Given the fact that the inmate's stay within the New Line area is only temporary (8 to 12 weeks) and that prisoners may remain outside their cells approximately six hours a day, I rule that conditions within that unit, while far from ideal, do not constitute an Eighth Amendment violation." 447 F.Supp. at 405.
 In Burks the court noted that an amicable atmosphere permeates the Penitentiary, that the prison climate was "exceptionally relaxed and friendly," 461 F.Supp. at 484, that the noise level was low during most of the day and night, that "an inmate need spend only a minimal amount of his day confined to his cell," and that the recreational activities were many and varied. Id. at 486. Nevertheless the court held as follows:
 "Under the totality of the circumstances which exist at the Missouri State Penitentiary, including but not limited to, the ability of inmates to move outside their cells during the day and evening hours, and to participate in numerous work, recreation, education, social, and service programs, and including also the high quality of the administration and staff employed at the Penitentiary, the Court finds:
 (a) that the double-celling of inmates in Housing Units 2 and 5 in 47.18 square foot cells does, even under the generally favorable 'totality of conditions' which exist at the Penitentiary, result in a living condition which this Court views as intolerable, inhumane, totally unreasonable in light of the modern conscience, and shocking to the conscience of the Court, in violation of the cruel and unusual punishment clause of the Eighth Amendment to the United States Constitution.
 (b) that the double-celling of inmates in Housing Unit No. 3 in 65 square foot cells does not cause a living condition which is intolerable, inhumane, totally unreasonable in light of the modern conscience, or shocking to the conscience of the Court, and thus is not violative of the cruel and unusual punishment clause of the Eighth Amendment of the United States Constitution." 461 F.Supp. at 487-88.
 
 
 [11]
 This situation led the Magistrate to conclude that,
 "given the incidence of double-celling at the Hartford Jail, and the inability of the guard to view the interior of the cells from his station inside the bubble, we feel that the potential for attacks by one cellmate upon another creates a grave risk of harm for inmates who are double-celled.... We are convinced by the evidence presented at trial, and by our own observations of the layout of the housing unit and its high noise level, that inmates in their cells can contact the guard in his bubble only with the greatest difficulty. Unless inmates are provided with adequate means by which they can communicate with the guard from their cells, we find double-celling so potentially dangerous as to constitute cruel and unusual punishment."
 
 
 [12]
 As the court in Capps v. Atiyeh, supra, 495 F.Supp. at 811, stated:
 "Indeed, the increased potential for violence is one of the most significant effects of overcrowding. The frictions which naturally attend being forced to live in close proximity to many other persons over long periods of time, when combined with the other stress and frustration-producing conditions of the institutions, generate tension, bitterness, resentment, and result in a general deterioration of morale which increases the threat of violence."
 
 
 [13]
 Warden Wezowicz testified that the state tried to move away from these alternatives in the following order: "As I said, we reversed the order. We placed inmates into those particular alternative sources. We stopped using the mattresses first, we stopped using the hospital second, and the day room, the general purpose room (the fishtank), if possible, lastly." Transcript, Vol. VIII, No. 10 at 116
 
 
 [14]
 In this regard, the various statistics from 1979 are instructive. The defendants' chart reveals that 75.5% of all detainees imprisoned that year were held for 15 days or less. Likewise, 50.8% of the sentenced inmates were released before the 30-day limit when a single cell would be required under our ruling. Under the district court's order none of these inmates could be double-bunked; under ours all may be. Since these numerous inmates occupy their cells for short periods of time, our calculations based on the plaintiffs' facility allocation chart indicate that on a daily average something in the neighborhood of 25 double-bunked cells will suffice to accommodate them all. Therefore, the time limits for double-bunking allowed here will aid the state significantly, assuming it is able to reduce somewhat the population of longtime inmates and so make available the relatively small number of double cells needed to hold the large number of shorttime inmates. In any case, however, flexibility for the state, whatever its good faith, can ultimately only go so far. Unconstitutional conditions cannot be tolerated because constitutional requirements are difficult for the state to fulfill. Campbell v. Cauthron, supra, 623 F.2d at 508
 
 
 [15]
 We have not adopted Judge Friendly's suggestion, infra, that we withhold our decision or stay the mandate until we have the benefit of the Supreme Court's views in Chapman v. Rhodes, now sub judice, since it is important that the appellants take steps immediately to rectify the conditions considered by all members of the court to be violative of detainees' rights and we have no assurance that Chapman will call for modification of our directions with respect to sentenced inmates. Should Chapman require such a revision, we will entertain a motion for reconsideration of that portion of our decision dealing with the Eighth Amendment rights of sentenced inmates and for that purpose we retain jurisdiction
 
 
 [1]
 The defendants have represented that the "fishtank" is no longer used in the manner established at trial and that the cells in the medical unit are no longer used to house healthy inmates
 
 
 [2]
 The Supreme Court's decision in Bell v. Wolfish did not concern the portion of this court's decision concerning the claim that overcrowding in the MCC imposed cruel and unusual punishment on the sentenced inmates confined in the facility. See 441 U.S. at 529 n.11, 99 S.Ct. at 1869 n.11
 
 
 [3]
 Even this was not shown to have had any untoward result
 
 
 [4]
 Although the district court also found that the levels of tension and anxiety had been increased by the overcrowding, I do not understand my colleagues to maintain that the Eighth Amendment requires a state to provide prisoners with an environment free of such stress. Any suggestion to the contrary in the passage from the district court's opinion in Capps v. Atiyeh, 495 F.Supp. 802, 811 (D.Ore.1980), quoted by the majority is more than counterbalanced by what Justice Rehnquist said in staying the injunction there issued pending review by the Court of Appeals or the Supreme Court's decision in Chapman v. Rhodes, supra, --- U.S. ----, ---- - ----, 101 S.Ct. 829, 830-31, 66 L.Ed. 785, 788-89 (1981):
 I know of nothing in the Eighth Amendment which requires that they (sentenced prisoners) be housed in a manner most pleasing to them, or considered even by most knowledgeable penal authorities to be likely to avoid confrontations, psychological depression, and the like. They have been convicted of crime, and there is nothing in the Constitution which forbids their being penalized as a result of that conviction.
 The Eighth Amendment did not enact the views of penological experts with respect to housing practices, however desirable they may be.
 
 
 [5]
 Reliance on goals of this sort to condemn Connecticut's practices is particularly objectionable because the State has been making a determined effort to improve conditions and the overcrowding at HCCC has been due to the unexpected delay in completing the Cheshire facility
 
 
 [6]
 The district judge noted that "(o)n occasion, the defendants have assigned two inmates to one cell in which there is no double-bunk bed", 507 F.Supp. at 1179, but this problem will be remedied by the portion of our decision, with which I agree, forbidding this practice
 
 
 [7]
 My conclusion is buttressed by the fact that not all the inmates in a cell-block need occupy the dayrooms at the same time. In addition to the alternative provided by the cells, which cannot be considered unacceptable for part of the day, especially if a prisoner's cellmate is in the dayroom or elsewhere, the jail includes a 30' X 60' classroom accommodating 50 inmates and a 4,000 volume library. Although the district judge discounted the educational program, which at the time of trial had room for 23 additional inmates, because "(m)any inmates have failed at, or dropped out of, school earlier in their lives; they are reluctant to return to school at the HCCC," this reaction has little if any relevance to the constitutional question. We are attempting to determine whether the conditions the State forces prisoners to endure are cruel and unusual. For purposes of this inquiry it is significant that prisoners participating in the educational program can escape the housing unit for about five hours a day; the State should hardly be branded as having engaged in cruel and unusual punishment because relatively few prisoners have chosen to use these facilities
 
 
 [8]
 Many of these cases are distinguishable on grounds in addition to those listed. See, e. g., West v. Lamb, 497 F.Supp. 989 (D.Nev.1980) (jail violated fire standards; exposed electrical wiring posed danger to inmates; and numerous rapes, homosexual attacks, inmates fights, and riots had caused many serious injuries and even deaths); Ramos v. Lamm, 485 F.Supp. 122 (D.Colo.1979) (inadequate medical care had caused serious injuries); Hutchings v. Corum, 501 F.Supp. 1276 (W.D.Mo.1976) (numerous attempted suicides, absence of fire safety precautions, and lack of adequate ventilation)
 
 
 [9]
 In Crowe v. Leeke the Fourth Circuit noted that there was no claim of unsanitary conditions or inadequate medical care and that a new facility was under construction
 
 
 [10]
 I am completely at a loss to understand the portion of fn. 15 to Judge Mansfield's opinion which characterizes my proposal as being one to withhold our decision or to stay the mandate on the entire case until the Chapman decision is rendered or the end of the Supreme Court's current term. My proposal to defer action has always been limited to the issue of double-bunking of convicted prisoners. Even if the majority cannot resist expressing its views on a constitutional issue on which the Supreme Court is about to speak, at minimum it should direct the district court to withhold implementation of the decision on this subject until it has had an opportunity to consider the Supreme Court's forthcoming opinion