Jose VAZQUEZ, Ralph Scott, Anthony Prentis, Allan Douglas, E. Agosto, James Lewis, Charles W. Allman, Gregory Diaz, Charles L. Hunt, and Michael Franklin, individually and on behalf of all other persons similarly situated, Plaintiffs,

v.

Albert D. GRAY, Jr., Commissioner, Department of Correction, County of Westchester; Norwood E. Jackson, Warden, Westchester County Correctional Facilities; Joseph M. Stancari, Associate Warden, Westchester County Jail; Richard Hildreth, Senior Assistant Warden, Westchester County Jail; and Alfred B. Delbello, County Executive, County of Westchester, individually and in their official capacities, Defendants.

No. 78 Civ. 4914 (GLG).

United States District Court,
S. D. New York.

Oct. 16, 1981.

Jack Greenberg, Joel Berger, Steven L. Winter, Claudia Angelos, New York City, for plaintiffs.

Samuel S. Yasgur, Westchester County Atty., White Plains, N. Y., for defendants; Marilyn J. Slaatten, Asst. County Atty., of counsel.

## OPINION

GOETTEL, District Judge:

The Westchester County Jail ("WCJ") is overcrowded. Everyone knows this—the

inmates, the corrections officers, the county officials and, in light of the riots that occurred at the jail in July of this year, even the public.

When the inmates commenced this action a few years ago, they complained about a number of aspects concerning the conditions at the jail. Since that time, and because of the riots, the focus of the action has been on the overcrowded conditions.[1] The plaintiffs presently seek a preliminary injunction enjoining various aspects of the overcrowding on the ground that the conditions existing at the WCJ violate the constitutional guidelines established by the Second Circuit in *Lareau v. Manson*, 651 F.2d 96 (2d Cir. 1981).

To be entitled to a preliminary injunction, the plaintiffs must make "a showing of possible irreparable injury *and* either (1) probable success on the merits *or* (2) sufficiently serious questions going to the merits to make them a fair ground for litigation *and* a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Caulfield v. Board of Education*, 583 F.2d 605, 610 (2d Cir. 1978). *See also Buffalo Courier-Express, Inc. v. Buffalo Evening News, Inc.*, 601 F.2d 48, 54 (2d Cir. 1979); *Triebwasser & Katz v. American Telephone & Telegraph Co.*, 535 F.2d 1356, 1358 (2d Cir. 1976). There is little dispute that, at least on certain claims, the plaintiffs have shown probable success on the merits and, to the extent that their Fourteenth Amendment rights are being violat-

ed, irreparable injuries. A difference of opinion remains, however, as to the causes of the overcrowding at the WCJ and the appropriate steps to be taken in dealing with it.

*Present Conditions at the WCJ*

On September 28, 1981, the Court inspected the conditions at the WCJ, which is in Valhalla, New York, adjacent to the Westchester County Penitentiary. The penitentiary houses sentenced misdemeanants. The jail houses pretrial detainees on both felony and misdemeanor charges, as well as prisoners awaiting transportation to state prisons, persons awaiting sentencing, and persons classified as "fugitives" and "escapees."[2] There is a separate facility housing women prisoners in the area, but it is not involved in these proceedings. (Neither the women's unit nor the penitentiary was extensively involved in the July riot, which was, for the most part, confined to the jail.) In addition, the Department of Correction maintains its headquarters in the area and has certain training facilities there.

The WCJ is designed to hold 263 pretrial detainees. On the date of the Court's inspection, there was a total of 413 inmates assigned to the jail. Only 301 of these, however, were in the jail proper, because some of the inmates were housed in the penitentiary.[3] (The pretrial detainees who are housed in the penitentiary are separated from the sentenced prisoners there.) In recent times, the number of assigned in-

1. The Court granted leave to file an amended complaint on October 5, 1981. The original class members are no longer in the jail and current inmates have been added as plaintiffs.

2. The judicial view of pretrial detainees is that they are persons who have superior rights to convicted prisoners. For example, the framework for evaluating complaints of unconstitutional conditions is, in the case of pretrial detainees, whether the conditions amount to "punishment" and, in the case of sentenced inmates, whether the conditions amount to "cruel and unusual punishment." *See Lareau v. Manson*, 651 F.2d 96 (2d Cir. 1981). From a corrections standpoint, however, the comparison between the groups can be quite different. The average person serving time in the Westchester County Penitentiary is only a few

months away from release. (Only misdemeanor convicts are in the penitentiary.) Many of the pretrial detainees in the jail are charged with very serious crimes or have long criminal records and face substantial periods of incarceration. They are a much higher risk population than the prisoners in the penitentiary. Consequently, greater security precautions and, generally speaking, higher levels of manning, are necessary for the jail than for the penitentiary. Indeed, the jail is classified as maximum security.

3. In order to make space available in the penitentiary, following the July disturbance, the County rented space for 50 prisoners in the Erie County Jail and transferred sentenced prisoners there. It is also negotiating to get 20 cells in the Yonkers City Jail.

mates has run as high as 460. There is also a tendency for the jail population to increase in the fall.

The Court's inspection established that the following conditions exist at the jail:

1. Two persons have been, on occasion, housed in a single occupancy cell of relatively small size by placing a mattress on the floor of the cell, on which one of the detainees must sleep.[4]

2. Minors, ages 16 through 20, were housed four to a cell with two sets of double bunks. (These cells are called "civil cells" because they were once used for prisoners in civil cases.) Although these cells are somewhat larger than the single occupancy cells (104 square feet) and might be adequate for two prisoners, they are not designed to contain four persons. Considering permanent fixtures in each cell, only about 60 square feet of floor space remains for the four inmates. These cells are terribly overcrowded.

3. The WCJ occasionally uses dayrooms as temporary housing for prisoners. These dayrooms are not equipped with toilet or sanitary facilities for multiple occupancy.

4. Dormitories have been utilized that do not provide the state required space of 75 square foot per prisoner.[5]

In addition to the crowded conditions of the cells, the jail has limited the inmates' access to dayrooms and recreational areas and has placed limitations on other privileges normally afforded to them.[6]

The defendants concede, as plaintiffs allege, that the overcrowding places a strain on all of the defendants' facilities, including medical, food service, law library, and recreation. The defendants also concede that the overcrowding produces tensions and hostilities. They even concede that the overcrowding was a major cause of the recent costly disturbances.[7]

The major difficulty presented to the Court by this case is fashioning suitable remedies for this particular facility. In the past, when federal district courts were confronted with overcrowded conditions in jails, the response was simply to set a population limit and leave to the prison officials the decisions as to how to meet these limits, thereby avoiding excessive intrusion by the courts into prison management. *See Bell v. Wolfish*, 441 U.S. 520, 547–48, 99 S.Ct. 1861, 1878–79, 60 L.Ed.2d 447 (1979). As Judge Friendly noted in his concurring and dissenting opinion in *Lareau*, that approach is reminiscent of the old saw that "[i]f the ship is leaking, sink it." 651 F.2d at 111.

The majority in *Lareau* indicates that district courts should take into account the duration of confinement under conditions found unconstitutional, *id.* at 103, and the state's ability to comply with district court orders without the need for releasing inmates. *Id.* at 110.[8] Although the courts should not excessively intrude into prison management, of necessity, we must look into the causes of overcrowding and the state's attempts to alleviate overcrowding to formulate feasible remedies.

*Causes of Overcrowding*

In evaluating the cause of overcrowding at the WCJ and remedial measures that can

---

4. The single occupancy cells are not all of uniform size, but many of them are as small as 45 square feet, part of which is taken up by the bed, washbasin and toilet bowl. Others are 56 and 68 square feet.

5. The New York State minimum standards are contained in 9 N.Y.C.R.R. § 7040.5 and require at least 75 square feet per prisoner plus other sanitary conditions for multi-occupancy housing.

6. These limitations are due in part to the overcrowding and in part in reaction to disciplinary and security problems evident from the July disturbances.

7. The County estimates the cost of the July riots to be in excess of $1 million.

8. The Supreme Court's recent decision in *Rhodes v. Chapman*, —— U.S. ——, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981) probably overrules those portions of *Lareau* concerning sentenced inmates. Since complaints of unconstitutional conditions by pretrial detainees are evaluated under the Fourteenth Amendment rather than the Eighth Amendment, *Rhodes* does not appear to overrule that portion of *Lareau* concerning pretrial detainees.

be taken, we are greatly assisted by a paper entitled "Westchester County Jail Overcrowding Study," prepared by the Center for Justice Planning ("CJP Study"). This study was commissioned by the County prior to the riots and was released in April of this year. We are also assisted by another report entitled "Westchester County Task Force on Jail Overcrowding—Final Report," prepared by the County Task Force on Jail Overcrowding ("Task Force Report"). Ironically, this study was commissioned only one day before the riots (whether there is some causal relationship is an interesting question) and was released just last week on October 10th. Although the Court does not agree with many of the conclusions reached by either study (the Task Force Report relies upon the CJP Study to some extent), the statistics and factual materials gathered are of great help.[9]

In analyzing the problems of the WCJ, one must bear in mind that the population at the jail is not homogenous. About half of all admissions (primarily those charged with minor offenses) are in jail no longer than twelve days.[10] Another quarter gets out in thirty days. It is only the remaining quarter who are in the jail for any lengthy period of time. These are primarily detainees awaiting felony trials and may be in jail for six months or more. Indeed, a few percent stay as long as a year. Although they constitute only a quarter of the jail population, because of the length of their stays, they are a substantial factor to be considered in terms of actual jail time consumed. (For example, one detainee who stays one year occupies as much jail space as 73 who average 5 days each.)

The most interesting observation of the CJP Study is that while the jail's average daily population increased 62.5% between 1974 and 1980, and increased another 25% by February 1981, these increases occurred while the total county population was actually falling slightly and the crime rate was increasing only slightly. The study concludes that the jail's overcrowding is not solely, or even primarily, the result of increasing crime but, rather, that the county's criminal justice system has adopted policies and procedures that have relied increasingly on pretrial detention. CJP Study at 1–7. Moreover, the number of persons being indicted has jumped dramatically, with 1981 running more than 50% above 1980. Task Force Report at 18. Not only are more pretrial detainees now being imprisoned, but they are also being held for longer periods. The net result has been an overcrowded jail. This is neither unique nor surprising. Recent news articles [11] indicate that the number of inmates in prisons in the United States rose by more than 20,000 in the first half of 1981. An increase for the entire year is projected at 12.8%. This contrasts with increases in previous years of only 2%, 3% or 4%. All but 5% of these new inmates are in state prisons. New York State's prisoner count rose to 24,267, an increase of 10.7%. Using only half of the most recent percent of annual increase, the CJP Study predicted that the population in the WCJ will double in five years and quadruple in ten years.

**9.** There is one problem inherent in attempting to obtain accurate statistics with respect to the Westchester County Jail population. Every time the County Department of Correction sends a prisoner to the custody of municipal courts for hearing, trials, or other judicial proceedings, that prisoner is statistically listed as having been released. If the court action results, as it often does, in continued incarceration, when the prisoner is returned to the WCJ, he is administratively readmitted, and statistically becomes a second jail admission. Approximately two-thirds of all of the jail population had multiple admissions and releases. Consequently, the figures on how long prisoners have been incarcerated at the jail are far from accurate. An attempt was made in the CJP Study to allow for this situation. For example, while the average length of stay in 1980, based on the current admission of each detainee, appeared to be slightly in excess of 14 days, the actual length of time in jail of the average inmate was found to be in excess of 38 days. CJP Study at 2–3.

**10.** Indeed, the jail stay may be as little as ten days, depending on the accuracy of the statistics.

**11.** The New York Times, Oct. 5, 1981, at A–17.

One of the alternatives suggested by the CJP Study and the Task Force Report for reducing the inmate population is to limit the number of jail admissions by releasing more defendants on their own recognizance without requiring them to post a cash bond. The CJP Study noted that a number of the persons incarcerated were charged with relatively insignificant crimes or had low bail but, nevertheless, were unable to make it. On the day that this Court visited the jail, there were thirty-three prisoners who were being held in bail of less than $1,000 and twenty for whom bail was exactly $1,000. It is wrong, however, to assume that unduly harsh bail practices caused the increase of the jail population. The initial charge against the defendant may be substantially less serious than the crimes with which he is ultimately charged. In addition, there is a type of rootless prisoner who, although charged with a rather insignificant offense, can be expected not to reappear when required and for whom bail is a necessity. Moreover, a low bail setting may not accurately reflect the court's concerns about the prisoner's likelihood of appearing for trial if released on bail. Very often, low bail is set because the defendant or his counsel advises the court that no bail whatever can be made.

Of course, the public sentiment against releasing prisoners on bail also plays a role. Although judges are supposed to be immune from public pressure, no judge, particularly an elected one, is immune from the adverse publicity generated by the commission of a crime by a person released on bail awaiting trial for earlier charges.

The experience of the New York courts following the July disturbances confirms these reservations about the value of bail reduction as a means for alleviating overcrowding. The courts made a significant effort to release any prisoner for whom any reasonable bail accommodation could be found. Despite this urgency, only a very small percentage of prisoners who had not previously made bail were able to obtain their release.

The CJP Study and the Task Force Report also focused on the length of stay of persons awaiting felony trials. New York's speedy trial rule requires misdemeanor cases to be tried within thirty days and felony cases to be tried within ninety days after initial action. *See* N.Y.Crim.Proc. Law § 30.30 (McKinney 1980 Supp.). The Study concludes that if the "spirit and intent" of New York's speedy trial law were realized, there would be no overcrowding crisis in the county jail. CJP Study at 34. Anyone familiar with the dynamics of criminal trials recognizes that it is impossible to bring a complex, multi-defendant case to trial within ninety days. For that reason, the federal Speedy Criminal Trial Act has numerous "exclusions allowing additional time within which a case must be tried". (It recently took this Court seven months to bring to trial a complex ten-defendant case in which close to 100 motions were filed.)

It is unlikely that, if there were adequate courtrooms, prosecutors, defense counsel, and judges, the speedy trial deadlines could be met for all (or almost all) felony cases. Considering the existing shortage in most areas of the criminal justice system, it is simply an unrealistic proposed solution.[12]

The Task Force Report concerns itself solely with the way in which the criminal justice system affects the jail population. Task Force Report at i. This is curious since, as the report aptly notes, "[t]he criminal justice system can be said to inherit the ills of society, and to reflect the earlier failures of other institutions which try to deal with them." *Id.* at ii. Although the

---

12. Another factor that keeps prisoners in jail is the time needed to obtain presentence reports prior to sentencing. The Study and Report urge that these be expedited. At least in the New York City system, steps have been taken to cut down the time for preparation of presentence reports. A challenge to this directive has recently been rejected by the New York State courts. *See* N.Y.L.J., Oct. 6, 1981, at 1. A proposal of the CJP Study that is not likely to meet with any great approval by the state judiciary is the suggestion that judges forego their summer vacations in order to avoid the annual cycle of overcrowding, which results in more prisoners being in the jail in the fall.

report makes twenty-four recommendations, only two have the potential for effecting significant reductions in the jail population.

The most expensive of their recommendations is the establishment of two additional permanent criminal court parts in Westchester County. Although the report attempts to justify the proposal by arguing that it is more cost-effective to spend funds on courts rather than on jails,[13] *id.* at xi, it appears, in light of the substantial increase in indictments, that it will be necessary, regardless of cost, merely to maintain present levels of processing.

The most controversial proposal is that nonviolent misdemeanants be given conditional discharges rather than short sentences. (Presumably, these discharges would be administered early in the prosecution, as part of a plea bargain, effecting a reduction in the jail population, rather than after trial, when they would reduce the penitentiary census.) This proposal is clearly contrary to the swell of public opinion seeking firmer treatment of criminals.[14] In addition, this Court has noticed in reviewing the records of hundreds of habitual criminals that many were launched on their careers by receiving conditional discharges from their first few prosecutions.

*Attempts to Alleviate Overcrowding.*

Westchester County has not been entirely remiss in meeting the overcrowding problem at its doorstep. It has already renovated a second floor administrative wing in the jail to provide twenty-two new cells and the necessary additional facilities. This wing should be opening this month. As noted earlier, it has rented space in Erie County and is presently negotiating for more space in the Yonkers City Jail. In addition, it has renovated two dormitories in the basement of the Women's Unit Annex, which can house approximately fifty-five prisoners. These dormitories will not be available until December, however, because the jail lacks sufficient correction officers to staff them. Hiring and training of sixty-seven new correction officers, now underway, will permit the dormitories to be opened in approximately two months.

On a longer range basis, the county plans to construct modular units capable of housing ninety-six sentenced prisoners next to the penitentiary. These are expected to be completed in the spring of 1982. This will make approximately eighty additional spaces available for jail prisoners in the penitentiary. In addition, it has begun construction of a new, separate block, which will add eighty-four cells to the jail itself. This construction, however, cannot be expected to be completed for at least one and one-half to two years. Whether these additional facilities, becoming available in the next year or two, will be adequate to cope with the increasing jail population will depend in great part upon whether there is a continued growth in the number of persons detained and the length of the detention.[15]

---

13. The cost savings is premised on the fact that defendants will spend less time in jail. This overlooks the reality that the great majority will be convicted, sentenced to the penitentiary, and given credit for time served in jail. Therefore, a shorter jail stay means more penitentiary time. However, as the report indicates, *id.* at xii, they are desirous of shifting costs from the county to the state and this would be one means of achieving that. The Report does not comment on whether there is adequate space in the County Court House to add two additional permanent parts, or what capital expenditures might be necessary to make this addition.

14. Although the Task Force had a large membership, most members were connected with social service type programs designed to deal with prisoners' problems, rather than representatives of the general public who are the victims of crime. There were no state or county judges on the Task Force.

15. The WCJ's ability to complete this long term construction may depend in part on the success of the proposed $500 million bond issue to build additional correctional facilities in the upcoming November state election. If these funds are approved, about one-quarter will go to county and local jails. N.Y. Times, Oct. 2, 1981, at B-2. There is substantial opposition to the bond proposal, some of it coming, surprisingly, from those interested in prisoners' rights. These people maintain that additional prisons are not the answer to crime and that alternate types of punishment, such as victim restitution, community service, and extended probation, are a more desirable remedy.

For the time being, and for purposes of this motion, we will concentrate on the immediate problems.

*Remedies.*

1. *Floor mattresses.*

■ *Lareau* makes clear that the use of floor mattresses constitutes punishment regardless of the number of days for which a prisoner is so confined.[16] 651 F.2d at 105. This practice must be eliminated immediately.

2. *Four detainees in a single cell.*

■ The housing of four minors in the "civil cells" clearly amounts to punishment and also must be stopped immediately. Curiously, this situation exists in part because of a New York law intended to benefit minors, which prohibits their being housed with adults. *See* N.Y.Correc. Law § 485 (McKinney Supp. 1980). Considering the consequences, it is clear that the minors are suffering from this segregation intended for their benefit. Particularly those over eighteen, who are not considered minors any longer for most purposes, would be better off being transferred to the somewhat more commodious adult accommodations. Regardless of how it is accomplished, the prison officials must reduce the population in each of these cells to no more than two inmates.

3. *Dayrooms.*

■ When the Court made its inspection, the jail was not currently using the dayrooms as sleeping quarters. It has, however, used them in the past and is likely to use them in the near future, considering the tendency of the jail population to increase during the fall months. When used, it is doubtful that they would be as crowded as the "fishtank"[17] described in *Lareau.* If the prisoners are not excessively crowded and are provided with beds, linens, and blankets, it would seem that the use of dayrooms, for brief periods not exceeding five days, would be allowable. The jail generally houses pretrial detainees who are not considered security risks in dayrooms. Coincidentally, the same type of inmate is generally among those released in twelve days or less. Consequently, the Court will not presently enjoin the use of dayrooms except when prisoners are housed in the dayrooms for more than five days.[18] The Court, however, will review the actual conditions if the dayrooms are used, and the defendants must advise the Court if detainees are lodged in dayrooms for more than 48 hours. Injunctive relief will issue if the conditions compare to the "fishtank" banned by the Court of Appeals in *Lareau,* or if it appears that the defendants have not complied with the intent of our directive.

4. *Dormitories.*

■ The Court does not view the present use of dormitories as being punishment. The one dormitory presently in use does have slightly less than the state prescribed 75 square feet per prisoner, but the amount of space allotted is equal to that in the

While alternate type sentencings attract substantial public attention, they are suitable for only a small percentage of persons convicted of crime. Although it is probably true that long criminal sentences have only limited general deterrent effect, and that they do so at a very expensive price, it is clear that the public at large desires this approach. The problem, in a nutshell, is that the public wants tougher sentencing, but is unwilling to pay for it.

16. We do not consider whether, when prisoners are first brought to the jail after the evening curfew, in the middle of the night, it might be allowable to put them on a floor mattress for the remainder of one evening. The plaintiffs protest about the holding of inmates "in bull-

pens" under these circumstances for undue lengths of time. The Court has not been presented adequate evidence to determine which is preferable, or whether either amounts to punishment.

17. The fishtank had nine inmates with 23 square feet of space each. They were required to crawl over each other to move around.

18. The use of dayrooms in this manner, eliminating their availability for their intended purpose, creates other problems which may ultimately require relief, but within the limited scope of this motion for preliminary injunction we do not address that form of overcrowding.

single cells described in *Lareau* and affords as much space as most of the older cells in the jail. The two new dormitories, holding 25 and 30 inmates respectively, provide even more space. The prisoners are no more crowded than they would be in an army barracks and less crowded than they would be aboard a naval vessel. Although other limitations on prisoner mobility presently in effect at the jail have acerbated the problem, the projected use of dormitories does not amount to genuine deprivation and hardship. Consequently, that branch of the motion is granted only to the extent the existing and planned uses will be set as maximum capacities.

*Conclusion.*

As indicated earlier, the Court is reluctant to impose any mandatory population limit on the jail. Although the jail is overcrowded, the overcrowding is no greater than that in *Lareau*, in which the Court of Appeals criticized the invocation of a population ceiling. That population exceeds rated capacity is not that significant because it is difficult to predict future prison populations. *Rhodes v. Chapman, supra*, 101 S.Ct. at 2400 n.15. The question before us is whether any of the conditions of confinement at the WCJ amount to punishment, and it is to that question that we have confined ourselves.

■ The plaintiffs have requested a comprehensive order dealing with all possible housing areas in the jail, contending that previous experiences in this type of case indicate that correction officials, in complying with specific court directives, will resort to other equally inappropriate measures. We assume that defendants will comply with the intent of the Court's present directives. We believe that the county correction officials are very eager to overcome the crowded conditions that create problems for them and their staff. The Court, therefore, will not issue the comprehensive order that the plaintiffs seek at the present time. If the remedies directed by the Court do not cure the particular problems, or if the de-

fendants fail to comply with the intent of the Court's directive, we will be forced to reconsider our approach. It has been quite common for orders emanating from this Court to New York City correction officials to include "release clauses" directing the release of those considered the best bail risks unless the overcrowded conditions were remedied. (To date, that alternative has never been resorted to, but recently the possibility has grown greater.)[19] Although our order does not presently include such a clause, the defendants are on notice that the Court will resort to such a directive, along with a population limit, if effective compliance is not obtained. The economic considerations of the county in failing to provide adequate facilities, in the words of *Lareau*, "cannot lawfully excuse the imposition on the presumptively innocent of genuine privations and hardship over any substantial period of time." 651 F.2d at 104.

SO ORDERED.

**19.** N.Y. Times, Oct. 3, 1981, at 29.