**Ronald ALBRO, Michael Carpenter, Neil Epstein and Harold Warner, Individually and on Behalf of All Persons Similarly Situated, Plaintiffs,**

v.

**The COUNTY OF ONONDAGA, NEW YORK, Sheriff of Onondaga County, Mario M. Cuomo, Governor of the State of New York, and Thomas A. Coughlin, III, Commissioner of the Department of Correctional Services, State of New York, Defendants.**

No. 85–CV–1425.

United States District Court,
N.D. New York.

Jan. 31, 1986.

As Amended Feb. 3, 1986.

Public Interest Law Firm, Syracuse University Law Clinic, Syracuse, N.Y., for plaintiffs, Daan Braveman, of counsel, Deborah J. Blood, Marcy Robinson Dembs, Da-

vid Greenspan, Connor O'Brien, Brenda Waight, Student Attys., of counsel.

Robert J. Rossi, Co. Atty., Syracuse, N.Y., for defendants Onondaga County and Sheriff of Onondaga County; Diane E. Tucker, of counsel.

Robert Abrams, Atty. Gen., Albany, N.Y., for Governor Cuomo and Com'r Coughlin; Paul D. Silver, of counsel.

## MEMORANDUM–DECISION AND ORDER

MUNSON, Chief Judge.

Not at all unique in the New York state prison system, the Onondaga county jail, known as the Public Safety Building ["PSB"] is overcrowded. It has been operating in excess of capacity consistently since May 1984 and there is no anticipated decrease in the near future. Plaintiffs commenced this action on October 25, 1985 under 42 U.S.C. § 1983 on behalf of all persons incarcerated at the PSB alleging that the overcrowded conditions under which the inmates are detained are intolerable and inhumane. Plaintiffs allege violations of their rights protected by the first, fourth, fifth, sixth, eighth, ninth and fourteenth amendments to the United States Constitution, the Constitution of the state of New York and New York statutes and regulations. Plaintiffs seek declaratory and injunctive relief and a preliminary injunction restraining defendants from exceeding the rated capacity of the PSB and otherwise incarcerating plaintiffs under unconstitutional conditions. A hearing on plaintiffs' motion for a preliminary injunction was held on October 31 and November 1, 1985.

This court certified the plaintiff class on November 21 under Rule 23(b), Fed.R. Civ.P., of "all persons who are or will be incarcerated during the pendency of this action at the PSB jail"; this class includes both pre-trial detainees and sentenced inmates. Plaintiffs allege that the pre-trial detainees are subjected to punishment in violation of the fourteenth amendment and sentenced inmates are subjected to cruel and unusual punishment in violation of the eighth amendment. Plaintiffs also allege that all inmates are deprived of their rights secured by the N.Y. Constitution Art. I § 6.

Plaintiffs' complaint names as defendants the County of Onondaga and the Sheriff of Onondaga County under whose auspices the PSB is operated.[1] The defendants moved to join the Governor of New York and the Commissioner of the New York Department of Correctional Services as additional defendants. The motion was granted to allow the state to participate in the hearing for a preliminary injunction subject to a motion for reconsideration after the hearing. The state defendants have now moved this court to vacate the court's order of joinder of the state.

### I.

The PSB jail has a maximum capacity of 212 inmates as rated by the New York State Commission of Corrections and as acknowledged by all of the parties in this action. There are 202 cells and one dormitory designed to house 10 inmates. Beginning in July 1983, the population has repeatedly exceeded the maximum capacity; since May 1984 to the present, the monthly average population counts reveal that the PSB jail has been consistently over capacity. These monthly averages as recorded by the jail administrators indicate that between May 1984 and the dates of the hearing, the population has fluctuated from between 2.4% to 31.1% over capacity. In the most recent months prior to the hearing, July 1985 to October 1985, the inmate population count has exceeded the maximum capacity by 19% to 26% representing an excess population of between 40 and 55 inmates.

---

1. The Sheriff of Onondaga County is charged with responsibility for the PSB under the New York Corrections Law:

   [T]he sheriff of each county shall have custody of the county jail of such county.

N.Y. Correct. Law § 500–c, subd. 1 (McKinney Supp.1986).

The PSB jail has four housing floors. Each of the floors 2 through 5 has 2 long cell blocks (cell blocks A and B) and 2 short cell blocks (C and D) with the exception of cell block 5C which is the dormitory. The inmates for which there is no cell space when the population exceeds 212 are housed in the corridors in front of the cells. These corridors run the length of the front of the cells and are 5 to 10 feet in width.[2] Up until October 30, 1985, the inmates housed in the corridors slept on mattresses on the floor. In the late afternoon of the day before the start of the hearing, the jail obtained cots from the county morgue. With the cots obtained from the morgue and a few others assembled from parts, there were 25 cots for use at the jail. So on the first day of the hearing most of the inmates housed in the corridors had cots on which to sleep. However, not all of the inmates were off of the floor because the population count was greater than 25 in excess of capacity.[3]

The number of persons housed in each of the corridors varies as the population fluctuates. At times up to 27 inmates have been housed on a long corridor and up to 9 on a short corridor. These inmates have no place to secure their personal belongings. All of the inmates in one corridor share one toilet. During the periods called "lock-out" in which inmates are locked out of their cells, all of the inmates are in the corrider and must share one bathroom which is a cell kept vacant for common use. There are no dayrooms in the PSB. The inmates spend virtually all of their time in their cells or in the corridors including meals

served to them there. At the time of the hearing, there was no physical recreation available to the inmates; the PSB roof was being repaired and to hasten the process, the gymnasium on the roof for the use of the inmates was used as a "staging area" for the construction, thereby making it unavailable to the PSB inmates.

The PSB obtained a variance from the Department of Corrections to suspend provision of the required hour of physical exercise per day. To be relieved temporarily from this requirement, the PSB was to substitute passive recreation. It appears that this was not done. Chief Jail Deputy Charles Pirro, employed by the Sheriff's Department with responsibility for running the PSB, testified that movies were shown in the chapel but could recall only one having been shown to some but not all of the inmates within the preceeding few months. Plaintiff Albro testified that he had been offered the opportunity to see two movies since he was admitted to the PSB jail on June 18, 1985. Passive recreation available to the inmates on the cell blocks consists of radio, television, cards, chess, checkers, letter writing, and reading. The inmates are permitted to leave the cell blocks to see visitors, attend religious services in the chapel, make telephone calls, appear in court, use the law library, attend Alcoholics Anonymous meetings and G.E.D. classes, and to visit the medical facility.

One result of the overcrowding has been the inability of the jail to segregate inmates appropriately.[4] Particularly acute in

---

**2.** The testimony on the width of the corridors was less than precise. These dimensions are those estimated by the witnesses and based on the photographs of the cell blocks introduced by plaintiffs and defendants. The corridors appear to vary in width.

**3.** Chief Pirro testified that on October 31, 1985 there were 239 inmates housed in the PSB which was 27 over capacity. He also testified that on October 22, 1985, the last date of the county's statistics presented to the court, the population count was 263, or 51 over capacity. On that date Chief Pirro stated that there were approximately 48 optional inmates: 17 boarders from Nassau County, 4 boarders from the feder-

al government, and 27 persons detained for parole violations only.

**4.** New York Corrections Law § 500-c provides in pertinent part:

"The New York Corrections Law no longer generally requires a county sheriff to separate inmates in a county jail according to the categories previously set out in N.Y. Correct. Law § 500-c (McKinney Supp.1986), 1970 N.Y. Laws c. 70, § 1, as amended; suspended effective Aug. 6, 1984, 1984 N.Y. Laws c. 908, § 1 (providing that § 500-c as repealed and replaced by 1984 N.Y. Laws c. 907, § 5, would be suspended rather than repealed). Rather, the new classifi-

this regard has been the practice of housing inmates in the corridor of cell block 2A where the mentally unstable inmates are housed. Plaintiffs testified that inmates housed in the corridor of 2A were often targets for human feces and urine thrown by the persons housed in the cells. In addition, security and safety problems arose from the jail's failure to house pre-trial detainees separate from sentenced inmates. Plaintiffs testified that the sentenced inmates "had nothing to lose" thereby exacerbating incidents of fighting, theft and extortion as against the pre-trial detainees who hesitated to defend themselves out of fear that additional charges would be brought against them.

Plaintiffs testified to the tense atmosphere caused by the close quarters in which the inmates were housed—that the high frequency of fights over minor items resulted from the tension. Security problems were increased due to the group sleeping arrangements in the corridors. Also, the inmates in the corridors had access to the individual cells.

Security provided by the deputy sheriffs is deficient. At the time of the hearing, the jail had the authority to fill 171 slots though only 151 were presently filled.

Chief Pirro testified that he was unable to fill the vacant positions because he was required to hire persons from a civil service list which list had been depleted and he would have to await the results of the previously-administered civil service examination. There was also testimony that some of the 151 persons who were due to retire shortly were abusing their sick leave privileges because the recently-negotiated change in the retirement system allows retirees to accumulate only a limited amount of unused sick leave time. Therefore some of the deputies due to retire shortly were calling in sick. Additionally Chief Pirro testified that there was an unusually high incidence of medical problems among the deputies resulting in their absence from work.

Dirome Williamson, Correction Facility Review Specialist for the State Commission of Correction, testified as to his most recent inspection of the PSB jail on September 11, 1985. Though his presence and purpose were known to the jail administrators at the time of his visit, Williamson noted that the deputies failed to make the required number of rounds of the cell blocks. There was testimony of fights breaking out which were not promptly controlled by the deputies because they were

cation statute mandates only that men be housed separately from women and persons under 19 years of age be housed separately from older inmates. N.Y. Correct. Law § 500–b subd. 3 & 4 (McKinney Supp.1986). Otherwise the statute provides that "the chief administrative officer [of the county jail] shall exercise good judgment and discretion" in assigning persons to facility housing units so as to foster the security of the jail and safety of inmates. N.Y. Correct. Law § 500–b subd. 7(a) (McKinney Supp.1986), added, 1984 N.Y. Laws c. 907, § 4. The statute goes on to enumerate factors relating to the personal history and characteristics of individual inmates which the chief administrative officer of the jail is to consider in assigning inmate housing. See N.Y. Correct. Law § 500–b subd. 7(b). Segregation of inmates according to statutory classification is mandated as follows:

    8. Where the commission finds substantial noncompliance with commission rules and regulations with regard to (a) minimum staffing requirements; or (b) maximum jail capacity and security requirements; or (c) where it is determined that the county does not have an approved service plan in effect pursuant to

article thirteen–A of the executive law or is found to be in non-compliance therewith, as provided in section two hundred sixty-three of such law, it shall prohibit the commingling of any of the following categories of inmates:

    (1) persons in custody on civil process, or committed for contempt, or detained as witnesses with persons detained for trial or examination upon a criminal charge with convicts under sentence;

    (2) persons detained for trial or examination upon a criminal charge with convicts under sentence;

    (3) persons under nineteen years of age with persons nineteen years of age or older: or

    (4) a woman detained in any county jail or penitentiary upon a criminal charge or as a convict under sentence with a man; and if detained on civil process, or for contempt, or as a witness in a room in which there are no other prisoners with a man, except with her husband....

N.Y. Correct. Law § 500–b subd. 8 (McKinney Supp.1986)."

not readily available on the cell blocks. When a fight broke out, plaintiffs testified that the inmates had to yell for a guard to come into the cell block to break up a fight. In addition to the increased security problem created by housing inmates in the corridors, there was testimony that the reduction in the deputy-to-inmate ratio hampered the deputies' ability to get to know the inmates individually so as to better anticipate threats to order in the jail.

## II.

Pre-trial detainees' fourteenth amendment protections include the right not to be incarcerated under conditions which amount to punishment "for under the Due Process Clause, a detainee must not be punished prior to an adjudication of guilt in accordance with due process of law." *Bell v. Wolfish,* 441 U.S. 520, 535, 99 S.Ct. 1861, 1871, 60 L.Ed.2d 447 (1979). Overcrowding amounts to punishment when it "subjects a detainee over an extended period to genuine privations and hardship not reasonably related to a legitimate governmental objective." *Lareau v. Manson,* 651 F.2d 96, 103 (2d Cir.1981).

Statistics maintained by the county reveal the average length of stay of inmates from January to October 1985 as follows:

| # of days | percentage of inmates |
|-----------|-----------------------|
| 1–2 | 56.5% |
| 3–10 | 24.1% |
| 11–30 | 8.4% |
| 31–1 yr. | 10.9% |

Of course these statistics do not measure the length of detention of inmates on any given day. Given the large percentage of inmates incarcerated for the shortest period of 1–2 days which increases to 70% for persons held 1–5 days, it appears that on any given day the average length of incarceration of inmates is considerably greater

than the presented statistics reveal. *See Lareau,* 651 F.2d at 102. To this extent these statistics indicate that many inmates are subjected to the hardships caused by the overcrowded conditions for a substantial period of time. Though a large percentage of the plaintiff class is incarcerated for a short period of time, there was no testimony indicating that only these short-term inmates were subjected to severe housing conditions. Although the Second Circuit has said these statistics bear on what remedy should be employed, *see id.,* these numbers offer little guidance to the court in attempting to fashion a remedy to reduce the population. However, they do suggest that inmates are subjected to the conditions for a sufficiently long period to amount to punishment necessitating a remedy to alleviate these conditions.

Here no justification is presented for the overcrowded conditions at the PSB other than the need or desire to house more prisoners than the maximum rated capacity. This does not constitute a legitimate governmental purpose which would excuse forcing pre-trial detainees to endure hardship and privations over an extended length of time.[5] *See id.* at 104. Accordingly, the only inquiry under the fourteenth amendment to be made by this court is whether the conditions at the PSB amount to punishment. The eighth amendment's prohibition against cruel and unusual punishment protects sentenced inmates from "unnecessary and wanton" inflictions of pain, including those that are "totally without penological justification." *Rhodes v. Chapman,* 452 U.S. 337, 346, 101 S.Ct. 2392, 2398, 69 L.Ed.2d 59. The inquiry as to sentenced inmates is whether the totality of conditions "deprive[s] inmates of the minimal civilized measure of life's necessities." *Id.*

Overcrowding has adversely affected many aspects of living conditions at the PSB for all inmates—sentenced inmates and pre-trial detainees alike. Housing in-

---

5. This conclusion that housing inmates at the PSB in excess of the maximum rated capacity serves no legitimate purpose is buttressed by the county's failure to seek a variance from the state Commission of Corrections to be relieved from

this requirement. Rather, the State Commission of Corrections cited the PSB in its 1984 evaluation for failing to comply with the Maximum Prisoner Capacity, N.Y.Admin.Code tit. 9 Executive (D) § 7040.1 (1983).

mates in the corridors affects others in the same corridor as well as persons in the cells on the corridors. There is increased tension and propensity for physical threats and violence because of the housing situation, the failure to segregate inmates by statutory classification, and the apparent inability of the deputies to adequately perform their supervisory duties. The population excess reduces the availability to all inmates of what limited alternative recreation is made available, such as movies shown. The lack of activities outside of the cell blocks makes the present housing situation especially severe because the inmates spend virtually their entire day in the cells or on the cell blocks.[6] Lack of housing space which results in mentally stable inmates being housed with those who are not is so obviously intolerable as to not warrant further discussion.

Before the cots were obtained, mattresses were laid on the floor and could be rolled up to make more floor space during the day. The cots are not a totally satisfactory solution to the housing problem. Though the conditions are in one sense not so egregious for those inmates no longer sleeping on the floor in the corridors, *see id.* at 105; *Vazquez v. Gray*, 523 F.Supp. 1359, 1365 (S.D.N.Y.1981), the cots create other problems. One is the decrease in available floor space because the cots cannot be folded. Also cots increase the threat to security as the testimony revealed that they can be disassembled to be used as a weapon. Chief Pirro testified that the increased security risk was the basis for his not obtaining cots sooner.

The county does not dispute that the PSB is overcrowded. It has made some effort to adapt to the overcrowding though nothing directed toward reducing the number of inmates housed at the PSB. The blame for the overcrowding does not, however, belong on the shoulders of the county, but because of the adverse effects on the living conditions caused by the continuous overcrowding something must be done with all due speed to alleviate the overcrowding. Though the county defendants are subject to order of this court to take affirmative steps to eliminate the unconstitutional conditions, the court would be remiss if it laid blame on the county officials responsible for running the PSB. Rather, the blame must fall squarely on the shoulders of the public which pressures legislators to increase criminal penalties yet simultaneously denies the authority for public expenditure for programs directed toward persons against whom these laws are enforced— whether these be alternative programs for pre-trial release or alternate sentences or for construction of additional prisons.[7] *See Rhodes*, 452 U.S. at 357, 101 S.Ct. at 2404 (Brennan, J., concurring) ("The problems of administering prisons within constitutional standards are indeed 'complex and intractable,' ... but at their core is a lack of resources allocated to prisons."); *Procunier v. Martinez*, 416 U.S. 396, 404–05, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974). As a result, the state prison system in New York is operating at 109% capacity and is causing a strain on the county jails as the number of inmates that the state can accept into its system has decreased. Therefore, the counties in the state, including Onondaga, are forced to house persons who should be in the state, rather than county, system. As the problem has continued, certain counties are particularly ov-

---

**6.** It has come to the attention of the court that the repair of the PSB roof is now complete and therefore it is assumed that the inmates now receive their hour of daily physical exercise in the gymnasium. However, this does not by itself obviate the finding that conditions at the PSB are unduly harsh both at the time the violations were presented to the court and at the present time, three months later. Rather, if active recreation is provided this will be a factor to be considered by the court if it must fashion a final remedy.

**7.** For example, the Security Through Development of Secure Correctional Facilities Bond Act of 1981, L.1981 c. 850, § 1 was not approved by the voters of the State in the general election held in November, 1981 thereby preventing N.Y. Correct. Law § 46 (subd. 5) (McKinney Supp. 1984) from taking effect. Codification Note foll. N.Y. Correct. Law § 46 (McKinney Supp. 1984).

ertaxed and have boarded out their own inmates to other counties either because of their recognition that they lacked space to house these inmates or by force of court order directing the counties to reduce their inmate population. *See e.g., Badgley v. Varelas,* 729 F.2d 894 (2d Cir.1984) (Nassau County); *Vazquez,* 523 F.Supp. 1359 (Westchester County).

### III.

To obtain preliminary injunctive relief, plaintiffs must show: "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979).

■■■ Plaintiffs' allegations that they have suffered and will continue to suffer constitutional deprivations from the conditions resulting from the overcrowding at the PSB jail satisfy the requirement of irreparable harm; deprivation of constitutional rights constitutes irreparable harm per se. *See e.g., Mitchell v. Cuomo,* 748 F.2d 804, 806 (2d Cir.1984) (and cases cited therein); *Fortune Society v. McGinnis,* 319 F.Supp. 901, 903 (S.D.N.Y.1970) (Weinfeld, J.). Plaintiffs have demonstrated a likelihood of success on the merits on their fourteenth amendment claim on behalf of pre-trial detainees that conditions of confinement amount to punishment, thereby making the granting of preliminary relief appropriate as to the pre-trial detainees.

Continuous overcrowding resulting in inmates being housed in the corridors—particularly those not provided cots; inmates not being segregated—particularly persons not mentally unstable housed with the mentally unstable inmates on cell block 2A; and the lack of activities outside of the cell blocks cannot be said to comport with contemporary standards of decency. *See Rhodes,* 452 U.S. at 347, 101 S.Ct. at 2399. Plaintiffs have therefore demonstrated serious questions going to the merits of their eighth amendment claim to make them fair ground for litigation. See *Jackson Dairy,* 596 F.2d at 72. Relief available to the pre-trial detainees would equally benefit the sentenced inmates. Therefore the balance of hardships on plaintiffs' claim for relief under the eighth amendment tips decidedly toward the plaintiffs and entitles the sentenced inmates to preliminary injunctive relief.

■■■ Because of its invidious effect on numerous aspects of plaintiffs' living conditions, *Lareau,* 651 F.2d at 100, the continuous overcrowding at the PSB as in recent months of 40–45 inmates over capacity must be eliminated. It is not that the maximum rated capacity sets an absolute standard above which the court must find a fourteenth amendment violation. However, the capacity as set by the State Department of Corrections does reflect an assessment by the Commission of Corrections of minimum standards deemed necessary to ensure that persons incarcerated at the PSB and other jails and prisons are provided adequate care while incarcerated. The Commission of Corrections is responsible for promulgating rules and regulations establishing minimum standards of care and has the duty to inspect correction facilities for compliance with these standards, including jail administrators' adherence to laws and regulations governing the rights of inmates. N.Y.Correct.Law § 45 (McKinney Supp.1986). *Cf. Wolfish,* 441 U.S. at 543 n. 27, 99 S.Ct. at 1876 n. 27; *Rhodes,* 452 U.S. at 348 n. 13, 101 S.Ct. at 2400 n. 13 (opinions of experts as to desireable prison conditions do not establish the constitutional minima). Indeed the Commission of Corrections has cited the PSB for its failure to adhere to the maximum rated capacity. *See infra* note 5. The court will not adopt the maximum rated capacity to set a mandatory population ceiling at this time in order to alleviate the overcrowding. The Second Circuit has expressed its disapproval of a district court setting an absolute population cap as a remedy for overcrowding because of the inflexibility of such a remedy. *See La-*

*reau*, 651 F.2d at 109–10. The court therefore will not mandate an immediate reduction to the maximum rated capacity of the PSB at this time. However, the design capacity incorporated in the Department of Corrections' maximum rated capacity can serve as an appropriate goal for the necessary population reduction either for the defendants, or if they do not act to reduce the overcrowding, then for the court.

The PSB houses what can be divided between mandatory and discretionary inmates. The discretionary inmates include "boarders": those persons housed pursuant to a contract with Onondaga County. Onondaga County at the present time has contracts with the counties of Nassau, Madison, Saratoga, Cayuga, and Oswego and with the federal government. At the time of the hearing, the PSB had 21 boarders—17 from Nassau County and 4 from the federal government. Also among discretionary inmates are persons arrested for parole violations with no additional state criminal charges filed against them. Generally, the PSB houses approximately 25 persons held for parole violations only. Chief Pirro testified that the number of discretionary inmates held in the PSB has remained relatively constant even prior to the overcrowding. Rather, he attributes the change resulting in overcrowding solely to the delay by the state in accepting state readies. The county has unsuccessfully attempted through a state court action to force the state to accept those inmates which the state is statutorily obligated to accept promptly from the counties and to reimburse the county for boarding expenses.[8] Regardless of the factors which the county believes have caused the overcrowding, the Sheriff of Onondaga County bears the responsibility for operating the jail and must be held accountable to plaintiffs for the unconstitutional conditions at the PSB.

Though the county may be correct in asserting that there would be much less overcrowding were it not for the problems caused by the state, for purposes of this litigation the county must accept primary responsibility for the current overcrowded conditions. This responsibility includes the obligation to take those measures within its power and control to reduce the population to appropriate levels and to insure that persons incarcerated at the PSB are not held under conditions violative of the Constitution. Therefore, the county must reduce the number of inmates held at the PSB. Though recognizing that a federal court is ill equipped to make decisions regarding jail administration, the court nevertheless must employ some remedy where the persons responsible for the unconstitutional conditions refuse to act. *Martinez*, 416 U.S. at 405–06, 94 S.Ct. at 1807–08. It appears to the court that the PSB should cease accepting discretionary inmates but the court will not order the county to reduce the population in this specific manner before the county has the opportunity to consider and propose its own alternatives that will effectively reduce the population at the PSB.

Although the court is mindful that the already strained state prison system and that of other counties may not easily bear the increased numbers from the reduction in numbers at the PSB, this consideration cannot prevent the court from ordering a reduction of the inmate population when presented with constitutional violations at the PSB. The long-range solution may be to develop alternatives to incarceration but until this is accomplished, the plaintiffs in this lawsuit should not be

---

**8.** The Supreme Court, Onondaga County, granted plaintiff's request for an order of mandamus compelling the Department of Correctional Services to accept and commit state prisoners within 36 hours of their sentencing pursuant to N.Y.Crim.Proc. Law § 430.20 and compelling defendants to reimburse the County for past expenses incurred due to the state's delay in accepting and committing prisoners. *County of Onondaga v. N.Y.S. Department of Correctional Services,* slip op. (N.Y.Sup.Ct., Onondaga County, Jan. 28, 1983), *rev'd,* 97 A.D.2d 957, 468 N.Y.S.2d 760 (App.Div., 4th Dept.1983), *aff'd,* 62 N.Y.2d 826, 477 N.Y.S.2d 606, 466 N.E.2d 146 (Ct.App.1984).

forced to endure the present conditions at the PSB.

## IV.

The state defendants have moved to vacate the court's order permitting joinder of Governor Mario M. Cuomo and Thomas A. Coughlin, III, Commissioner of the Department of Correctional Services. The state defendants argue that the state defendants should not be joined because complete relief can be granted as among the existing parties. *See*, Rule 19(a), Fed.R.Civ.P.;[9] *Badgley*, 729 F.2d at 901.

■■■ Though the county defendants possess primary responsibility for operating the PSB, the county has shown that it does not act completely autonomously in controlling the population at the PSB. The various county jails and the state Department of Corrections through a state computer link receive and exchange information on population levels at the various prison facilities state-wide. Also, the county has successfully argued that any reduction in population achieved at the PSB could easily be negated by the state's slowing down the rate at which state-ready inmates are accepted from the PSB based on the state's monitoring of available space at the PSB and other county jails. The state's contributing to the overcrowding and hampering the county's ability to reduce the population at the PSB makes the state properly a defendant in this action.[10] *See Benjamin v. Malcolm*, 88 F.R.D. 333, 335 (S.D.N.Y. 1980). Therefore, it appears practical to keep the state defendants in this action to cooperate with the county defendants in developing an immediate and a long-range solution to the overcrowding at the PSB.

## V.

To remedy the housing conditions at the PSB, the court orders the following:

Effective within 5 days after the date of this order, no inmate may be housed on the floor of a corridor but must be on a cot.

Effective within 2 days after the date of this order, no general inmate not believed to be mentally unstable nor under observation for mental instability may be housed with the mentally unstable inmates currently housed on cell block 2A.

The parties are directed to appear in person, or by way of their attorneys, for a conference with the court on February 14, 1986 at 11:00 a.m. to present specific proposals for reducing the inmate population at the PSB. The county should consider terminating its existing contracts to house boarders and ceasing to accept discretionary inmates, including persons arrested for parole violations only.

The county is ordered to prepare and submit to the court at the conference a report of the number of persons accepted each day and daily totals of the inmate population at the PSB indicating how each is classified; i.e. parole with criminal charges, parole only, new criminal charges only, state readies (indicating which of the state readies are also contained in the parole only, parole with criminal charges and

---

**9.** Rule 19, Fed.R.Civ.P. "Joinder of Persons Needed for Just Adjudication" provides in pertinent part:

> (a) Persons to be Joined if Feasible. A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties.... If he has not be so joined, the court shall order that he be made a party.

**10.** A *Pennhurst* problem does not appear to exist at this time because the remedial order is founded on a duty owed to the plaintiffs by defend-

ants under the United States Constitution and not directly on state law. *See Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (Pennhurst II); *Badgley v. Varelas*, 729 F.2d 894, 901 (2d Cir.1984). While state law may impose a connection between the state and county defendants, state law nevertheless is not the basis for holding the state defendants potentially liable to the plaintiffs. Rather, state law merely evidences that the state is in a position to affect the population levels at the PSB. Accordingly, the state defendants are properly joined under Rule 19(a) to facilitate or at least not impede the vindication of plaintiffs' constitutional rights.

new criminal charges only categories), and boarders.

The motion by defendants Governor Cuomo and Commissioner Coughlin to vacate this court's prior order permitting joinder is denied.

IT IS SO ORDERED.