Ronald ALBRO, Michael Carpenter, Neil Epstein and Harold Warner, Individually and on Behalf of All Persons Similarly Situated, Plaintiffs,

v.

The COUNTY OF ONONDAGA, NEW YORK, Sheriff of Onondaga County, Mario M. Cuomo, Governor of the State of New York, and Thomas A. Coughlin, III, Commissioner of the Department of Correctional Services, State of New York, Defendants.

No. 85–CV–1425.

United States District Court, N.D. New York.

Jan. 14, 1988.

Order April 5, 1988.

Public Interest Law Firm, Syracuse University Law Clinic, Syracuse, N.Y., for plaintiffs, Kirk Hazen, of counsel.

Robert J. Rossi, Co. Atty., Syracuse, N.Y., for defendants County of Onondaga and Sheriff of Onondaga County, Diane E. Tucker, of counsel.

Robert Abrams, Atty. Gen., State of N.Y., Albany, N.Y., for Governor Cuomo and Commissioner Coughlin, Lawrence Zimmerman, Asst. Atty. Gen., of counsel.

## MEMORANDUM—DECISION AND ORDER

MUNSON, Chief Judge.

Once again, the persistent overcrowding and other unsafe conditions at the Onondaga County Public Safety Building draw the attention of this court. Over the course of the past 27 months, this court has issued a succession of increasingly detailed orders designed to temporarily and partially correct some of these conditions at the Public Safety Building. These orders were also designed to show, through a recitation of the facts and the law, what needed to be done and why. It was the hope of this court that those responsible for the Public Safety Building would discern from these orders and the proof in the hearings upon which the orders were based the problems involved and the need for their prompt resolution. The court has been informed that the county defendants, who have primary responsibility for the Public Safety Building, have recently evidenced efforts to responsibly confront the issues which necessitated plaintiffs' commencement and continued prosecution of this action.

Despite these efforts, more needs to be done. The court is well aware that the expenditure of tax dollars on prisons is unpopular with the public and an anathema to politicians. Nonetheless, the time for delay is over, difficult choices must now be made.

The public should realize that this order is directed towards conditions at the Public Safety Building rather than at the Onondaga County Correctional Facility at Jamesville, New York. The Jamesville Penitentiary holds inmates who have been convicted and sentenced to prison terms. By contrast, the Public Safety Building's population is made up almost entirely of pre-trial detainees, persons who not only have not been tried, but who are presumed to be innocent under the United States Constitution. Moreover, the prison's staff numbers in the hundreds and includes approximately 150–170 guards who are directly exposed to any dangers created by the conditions at the Public Safety Building. Thus, the problems at the Public Safety Building are indeed quite human in their dimensions, and their resolution will benefit many, both inside and outside the facility.

In reaching the conclusions contained in this Memorandum–Decision and Order, the court draws from the previous testimony of witnesses and the facts stipulated to by the parties. It is the court's intention, barring unforeseen circumstances, that this Memorandum–Decision and Order shall serve as the final adjudication of the merits in this action and shall resolve plaintiffs' request for a permanent injunction.

### I.

While the parties are surely familiar with this court's Memorandum–Decision and Or-

der of January 31, 1986, as amended on February 3, 1986, and its Order rendered from the bench on June 26, 1987, a short review is appropriate. Plaintiffs commenced this action in October of 1985 pursuant to 42 U.S.C. § 1983. They pointed to the combined effect of the consistent overcrowding at the Public Safety Building, the housing of inmates on mattresses on catwalks, the failure to segregate mentally stable and unstable inmates, the insufficient number of deputies, the threat of violence and other problems in support of their claim that their rights protected by the first, fourth, fifth, sixth, eighth, ninth and fourteenth amendments to the United States Constitution, the Constitution of the State of New York and various New York statutes and regulations were being violated.

Plaintiffs initially sought preliminary injunctive relief and a hearing in that regard was held on October 31 and November 1, 1985. Much of the salient testimony from that hearing is reviewed in this court's January 31, 1986 Memorandum–Decision and Order. As the court then noted, overcrowding by as much as 31.1% over the prison's rated capacity of 212 inmates had existed since July of 1983. Other testimony confirmed the existence and severity of the problems cited by plaintiffs and led the court to conclude that preliminary relief was appropriate. That relief required that no inmate be housed on a corridor floor and that mentally stable and unstable inmates be segregated. The court suggested, but did not require, that the county discontinue accepting discretionary inmates, who include certain parole violators and those accepted pursuant to contracts with other counties and the Federal government. The court also urged the parties to devise and present specific proposals designed to effectuate a reduction in the Public Safety Building's inmate population.

Soon after the issuance of the court's Memorandum–Decision and Order the county terminated its contracts with the federal government and other counties; however, no further efforts were undertaken to reduce the prison's population. On July 17, 1986, after several months of fruitless efforts between the parties, the court appointed Mr. Donald Stoughton as the court's Special Master. Despite Mr. Stoughton's efforts, the parties remained unable to accomplish and maintain a reduced prison population. One principal barrier was the state's intransigence concerning removal of its state-ready prisoners. That problem, along with others, compelled the court to direct the parties to appear at a hearing in order to show cause why a maximum prisoner capacity or other appropriate interim relief should not be ordered.

That hearing was held on June 18, 1987. The court rendered its decision from the bench on June 26, 1986. Prior to rendering its decision, the court heard from Mr. Stoughton who informed the court of the then current inmate population figures, figures which were only somewhat higher than those for the preceding months. During the week of June 26 the inmate population averaged 288 inmates, nearly 36 percent above capacity. Included in that total were 91 state-ready prisoners.

Following Mr. Stoughton's brief report, the court once again cited the litany of problems plaguing the Public Safety Building—the overcrowding, the failure to properly segregate prisoners, the lack of adequate recreational facilities, the dangers to prisoners and guards alike posed by housing prisoners on walkways and the chronic shortage of prison personnel, including guards. Particularly disturbing to the court was the fact that, in the 17 months following the court's January 31, 1986 Memorandum–Decision and Order, the parties had been unable to arrive at any plan designed to reduce overcrowding at the Public Safety Building. Unswayed by the county's assertion that if the state were to remove all of its prisoners the Public Safety Building's population would be within the 212 limit, yet disturbed by the state's lack of cooperation, the court entered an Order directed at both county and state defendants.

The state was directed to reduce the number of state-ready inmates to 40 by July 24, 1987 and to a maximum of 10 by

August 21, 1987. The county, in turn, was directed not to permit the prison population to exceed 248 from July 24, 1987 onward. In a manner similar to that found in its January 31, 1986 Memorandum–Decision and Order, the court suggested means for the county to effectively reduce the Public Safety Building's population to the newly imposed limit. These suggestions included the extreme measures of releasing prisoners or terminating the delivery of new inmates. Less drastic, and in deference to the expertise of those more closely involved with the jail's administration, was the court's admonition that the county develop both short and long term programs addressing the prison's overcrowding.

Since June 26 appreciable efforts have been made by the various defendants. Commendably, the state has sharply, and in timely fashion, reduced the number of state-ready prisoners to the level imposed by the court. In the past 17 weeks the average number of state-ready prisoners has only exceeded that level by 3 prisoners on 2 occasions and 1 prisoner on another.

Overall population figures, particularly those since the end of October, are somewhat encouraging. In the roughly five-week period from October 28 through December 3, 1987, the average population at the prison was 220 inmates, and did not exceed, on any given day, 228 inmates. From mid-September through early October the population averaged 216 inmates.

Unfortunately, population figures for other week long periods since June have averaged as many as 255 inmates. The figures also reveal unexplained fluctuations which suggest to the court that the gains made may be more a product of chance or circumstance rather than the concerted efforts of the County. Ultimately, it is apparent that the prison population is still consistently above its maximum rated capacity of 212 and well above a number which would leave officials able to safely accommodate an inevitable sudden influx of prisoners.

As before, this situation must be dealt with. And, as before, the court will examine the conditions of confinement prior to rendering its Order.

## II.

Were the Public Safety Building's population housed in distinct areas, one holding pre-trial detainees and the other containing sentenced prisoners, the court would be compelled to separate the plaintiff class into two groups and examine the claims of each group under different constitutional provisions. *Bell v. Wolfish,* 441 U.S. 520, 535, 99 S.Ct. 1861, 1872, 60 L.Ed.2d 447 (1979). However, the Public Safety Building population cannot be so segmented. Indeed, following the sharp reduction in the number of state-ready prisoners, it is evident that the Public Safety Building population is comprised, almost in its entirety, of pre-trial detainees. What few state-ready prisoners remain are, apparently, housed indiscriminately within the general population of pre-trial detainees. Thus, conditions at the Public Safety Building must necessarily be examined in accordance with the more stringent constitutional protection afforded pretrial detainees.

Unlike a sentenced prisoner, who, having been adjudged guilty, may not be subjected to "cruel and unusual" punishment, a pre-trial detainee simply may not be held under conditions which amount to punishment. *Id.* at 535, 99 S.Ct. at 1872. The protection afforded pre-trial detainees flows from the Due Process Clause of the fourteenth amendment rather than from the eighth amendment's proscription against "cruel and unusual" punishment. *Id.* There is no set formula for determining whether the conditions of confinement amount to punishment. However, the Second Circuit has stated that overcrowding amounts to punishment when it is "shown that the overcrowding subjects a detainee over an extended period to genuine privation and hardship not reasonably related to a legitimate government objective." *Lareau v. Manson,* 651 F.2d 96, 103 (2d Cir. 1981).

In its January 31, 1986 Memorandum–Decision and Order the court examined statistics measuring the average

length of stay of inmates at the Public Safety Building. The court interpreted those statistics to indicate that many inmates were at that time being subjected to the hardships caused by the overcrowded conditions for a substantial period of time. The defendants have not contested that determination, nor have they presented the court with any evidence suggesting that the average length of a detainee's stay has diminished.

Moreover, the defendants have not presented any evidence suggesting that the privations and hardships caused by the overcrowding have been lessened. While average prison population figures are down, inmates are necessarily sleeping on cots in the walkways whenever the population exceeds 212. These cots are placed directly outside the cells of other inmates. Those housed on cots have no private space, no means of securing personal belongings, no means of closing off the noise from radios, televisions and voices within the cells, and no protection from other inmates sharing the walkway space or from other inmates when those inmates are permitted to leave their cells. This situation has continued for too long. While the court has not been made aware of any specific acts of violence attributable to these conditions, it is surely only a matter of time before an unfortunate, and in the court's view, avoidable incident occurs.

Guards responding to problems within a given cell or along a walkway or on their periodic rounds are at great risk. Not only are their numbers insufficient to adequately police the Public Safety Building, but they are compelled to enter walkways where they are greatly outnumbered. The prisoners have ready access to weapons through the dismantling of their cots. Under these circumstances, prisoners and guards alike are imperiled. Both groups have a right to be protected from the threat of violence. *See, Jones v. Diamond,* 636 F.2d 1364, 1373 (5th Cir.1981) (citing *Withers v. Levine,* 615 F.2d 158 (4th Cir. 1980)).

The housing of prisoners in the walkways creates a further hazard. Many of the components of the Public Safety Building's fire safety procedures require use of the walkways, including their use for evacuation and for access to smoke and fire barriers. Passage through the walkways, particularly under smoke filled conditions, would be severely hampered by the cots. Thus, while the court recognizes that the county has at least partially funded[1] improvements in the fire and life safety provisions at the Public Safety Building, the court also believes that the inmates and guards should not "be subjected to the unreasonable threat of injury or death by fire and need not wait until actual casualties occur in order to obtain relief from such conditions." *Hoptowit v. Spellman,* 753 F.2d 779, 784 (9th Cir.1985); *Ramos v. Lamm,* 639 F.2d 559 (10th Cir.1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981). Even if conditions at the Public Safety Building were fully compliant with all safety codes, which they clearly are not, overcrowding and the housing of prisoners in the walkways would threaten safety. It behooves the county to eliminate that risk.

The court also observes that inmates still remain in their cells nearly 23 hours a day. Their "free" hour, at least during the often present inclement weather native to Syracuse, is spent on the walkway. There is no evidence that inmates engage in anything other than such passive recreation as cards or checkers. Use of the indoor gymnasium is not provided to the inmates; moreover, the gymnasium may soon be converted into housing space. Detainees, even those at the Public Safety Building for only a short time, ought to be afforded at least 1 hour of exercise per day. *See, e.g., Rhem v. Malcolm,* 389 F.Supp. 964, 972 (S.D.N.Y. 1975) (expert testimony to that effect); *Parnell v. Waldrep,* 511 F.Supp. 764, 770 (W.D.N.C.1981) (where jail's physical layout gave inmates little opportunity to move about, "failure to provide proper physical

---

1. The "Fire Protection/Life Safety" report submitted by Robson & Woese, Inc. indicates an estimated $1,988,000 will be required to complete all necessary repairs and upgrading. To date, $950,000 has been appropriated.

exercise and recreation to pretrial detain-ees violates the due process clause of the Fifth and Fourteenth Amendments."); *see, Campbell v. Cauthron,* 623 F.2d 503 (8th Cir.1980); *Smith v. Sullivan,* 553 F.2d 373 (5th Cir.1977).

It is not the fact of overcrowding, in and of itself, which leads the court to conclude that conditions at the Public Safety Building have been, and continue to be, unconstitutional. Under certain circumstances, overcrowding could be compensated for, perhaps through the provision of ample exercise time, or vocational training or free time in a day room or other open space. These, or similar alternatives, are not available at the Public Safety Building. The Constitution requires this court to look to the totality of circumstances at the Public Safety Building. *Rhodes v. Chapman,* 452 U.S. 337, 362–63, 101 S.Ct. 2392, 2407–08, 69 L.Ed.2d 59 (1981) (Brennan, J. concurring); *Lareau,* 651 F.2d at 107.

The overall view is unsatisfactory, and has remained so for too long. The county does not even attempt to argue that a "legitimate government objective" guides its management policies at the Public Safety Building. *Lareau,* 651 F.2d at 103. This concession is appropriate; there simply is no justification for years of what can only be described as ostrich-like neglect. Fiscal restraints may exist; nonetheless, economic factors may not be cited as the basis for continued imposition of hardships and privations upon the Public Safety Building's guards, staff and inmates, nor may they stand in the way of improvements which must be made in order to bring conditions at the facility into compliance with the United States Constitution.

### III.

As noted earlier, the county has recently taken certain actions which demonstrate its intention to responsibly confront problems at the Public Safety Building and with the county's overall prison population. A study was completed last July concerning the temporary utilization of the gymnasium for housing. On October 5, 1987 the county authorized the issuance of bonds totaling $290,000 to finance the conversion of the gymnasium. On that same day, bond issues totaling $950,000 were authorized to fund fire and life safety improvements at the Public Safety Building. In early December, $93,000 was appropriated to finance an architectural study which would yield short and long term plans for the Public Safety Building and the Jamesville Penitentiary.

These appropriations mark a good starting point. However, in making these limited appropriations, the county evidences its awareness that without further funding, these initial appropriations would be wasted. Clearly, the county understands that more must be done. The court agrees; more must be done.

### IV.

Having determined that conditions at the Public Safety Building are violative of the United States Constitution, the court orders the following:

Mr. Donald Stoughton shall, if he so chooses, remain as the court's Special Master.

Effective March 15, 1988, the population of the Public Safety Building shall not exceed its maximum rated capacity of 212 inmates.

By that same date, March 15, 1988, the county shall submit to the court a short term plan which will discuss, at minimum, the following issues: the short term plan's starting and finishing dates, the number of inmates covered by the plan, any proposed use of the gymnasium or other structures, procedures which will be implemented to insure the constitutionality of prison conditions, fire and life safety issues and population forecasts.[2] The plan should also ad-

---

**2.** While this Memorandum–Decision and Order is directed towards conditions at the Public Safety Building, the court believes it would be shortsighted for the county to consider population forecasts for that facility only. Projections should include county wide estimates, and should be broken down into such subgroupings as male/female and presentenced/sentenced inmates. Population forecasts should be made

dress the requisite variances which must be obtained from the New York State Commissioner of Corrections.

■ From April 1, 1988 onward fines will be calculated in accordance with the following schedule.

| Prison Population | Per Day Fine |
|---|---|
| 213 – 217 | $ 1,000 |
| 218 – 222 | 2,000 |
| 223 – 227 | 3,000 |
| 228 – 232 | 4,000 |
| 233 – 237 | 5,000 |
| 238 – 242 | 6,000 |
| 243 – 247 | 7,000 |
| 248 & upward | 10,000 |

The county shall submit to the Special Master and to plaintiffs at the end of each week daily tally sheets for the preceding week indicating the number of prisoners at the Public Safety Building. These sheets will also indicate the number of state-ready prisoners in the prison.

Although daily records will be kept, fines will not accrue unless the population exceeds 212 on four consecutive days. That is, for the first 72 hours, or three-day period, the county will have the opportunity to correct any overage without penalty. In effect, a 72-hour grace period is provided the county. However, if the county fails to bring the population to or below the 212 limit within that 3-day period, then from the fourth day of violation onward until the population is again brought to the 212 limit, a fine will accrue. The fine on that fourth day will be based on the number of prisoners in excess of 212 recorded on the first day, again to encourage corrective measures by maintaining the three-day grace period. The fine for a fifth consecutive day of violations would be linked to the number of prisoners in excess of 212 on the second day. If on the sixth day the population was reduced to 212 or less, no fine would accrue, nor would any fine accrue until four consecutive days of excess were again recorded.

■ As to fines assessable under provisions of this court's June 26, 1987 Order, the court notes that despite plaintiffs' decision to withdraw their motion for contempt, the court retains the power to punish any contempt which may have occurred, or which may in the future occur, in violation of that Order. The court also notes that the 248 prisoner limit set in that Order remains in force until the reduction to 212 inmates mandated by this Memorandum–Decision and Order.

The Special Master will maintain a current record of any fines which accrue.

On 48-hour notice to all parties the court may schedule a hearing with regard to progress, and the accrual of fines.

By August 1, 1988 the architectural and consultant's report contracted for by the county shall be filed with the court. The parties will at that time meet with the court to discuss implementation of the plan, and the situation with regard to fines which may have accumulated.

By November 1, 1988 a final implementation schedule for the long term plan will be submitted. Aside from the issues discussed in the report, the county must be prepared to set forth its proposals for funding implementation of the long range plan.

It is So Ordered.

## ORDER

Through a Memorandum–Decision and Order dated January 14, 1988 and an Order dated March 22, 1988, this court sought to compel certain actions on the part of the county defendants. Principal amongst these was the creation and implementation of a short term plan designed to alleviate the unconstitutional conditions found at the Public Safety Building while the county formulated and made fully operational a plan which would eliminate these conditions over a substantially longer period. This short term plan has now been received by the court. The plan calls for the temporary utilization of the Public Safety Building's gymnasium as housing space.

Having engaged in discussions with the parties and the court's special master, the court orders the following as conditions for

for each of the coming five years, and in five-     year increments thereafter for twenty years.

the county's short term utilization of the gymnasium:

1) Only prisoners properly classified as minimum security may be housed in the gymnasium. Such classification is to be limited to those who require the least amount of physical and operational security.

2) The total number of prisoners to be housed in the gymnasium at any one time shall not, unless otherwise indicated by the court, exceed 15.

3) During the first week of each month the special master will apprise the court of the conditions of confinement and will provide an evaluation of the gymnasium's operation. Based upon this information, and possible meetings with the parties, the court will make a monthly determination of whether to continue or modify the permissible usage of the gymnasium.[1]

4) Effective immediately, fines will accrue at the rate of $1,000 per day for each prisoner in excess of the specified limit. Unlike the schedule governing the accrual of fines in the Public Safety Building proper, there will be no grace period for overcrowding in the gymnasium.

While the above is directed specifically at the gymnasium, further instruction directed at the entire facility is necessary. The court has already indicated through channels less formal than an order that an interim plan must be developed to meet the anticipated shortfalls in housing space suggested by the population forecasts supplied by the defendants' experts. It appears from these forecasts that approximately 80–100 additional beds will be necessary before the county can realistically expect to fully implement a long range plan.

Therefore, the county shall submit an interim plan to the court by April 15, 1988. Though this time frame may appear unduly short upon first glance, the defendants have been aware of the rather foreboding population forecasts and of the necessity for such a plan for a considerable period of time. This interim plan must describe how the county intends to handle its excess prisoner populations pending completion of a long range plan and should do so with the understanding that use of the gymnasium for housing prisoners will be reviewed once the interim plan is in place.[2] The interim plan must consider, at minimum, the population forecasts, the number of prisoners expected to be served, the security classification of those prisoners, the conditions of confinement, and the plan's operational aspects.

The county should understand that full implementation of the interim plan at the earliest possible date is a necessity. Therefore, the county must also supply, on April 15, a time schedule for implementation, a discussion of costs and a plan for gaining expedited funding.

Finally, the court did not, in its Memorandum–Decision and Order of January 14, 1988, fine the county for evident failures to comply with earlier orders of this court. The principal reason for this decision was the court's perception that the county was making good faith efforts to finally resolve the issues which necessitated the bringing and continued prosecution of this action. One particularly promising action taken by the county was the appropriation of $950,000 for fire and life safety improvements. There is no indication that the county has actually begun to utilize those funds.

As the court made amply clear in its January 14 Memorandum–Decision and Order, fire and life safety improvements must be an essential element of the county's efforts to bring the Public Safety Building's conditions into conformity with constitutional requirements. Therefore, as an additional component of the interim plan, the county must detail its intentions concerning the fire and life safety improvements, including a time schedule for imple-

1. The county shall supply the special master with whatever reports he requests. The county shall continue to supply weekly population figures covering the Public Safety Building proper, and shall supplement those figures with a sepa-

rate weekly accounting of the gymnasium's population.

2. This review will be in addition to that undertaken monthly.

mentation. The plan must make provision for the housing of those prisoners who will be displaced from their cells while the fire and life safety improvements are undertaken.

It is So Ordered.